In re SUGAR INDUSTRY ANTITRUST LITIGATION.

Milton FREEDMAN et al., Plaintiffs,

v.

AMALGAMATED SUGAR CO. et al., Defendants.

STOTTER & CO., INC., Plaintiff,

v.

AMSTAR CORPORATION et al., Defendants.

MONTELEPRE MEMORIAL HOSPITAL, INC., Plaintiff,

v.

AMSTAR CORPORATION et al., Defendants.

Leonard GREENBERG, d/b/a Food Mart, Plaintiff

v.

AMSTAR CORPORATION et al., Defendants.

PASCAL'S MANALE RESTAURANT, INC., Plaintiff,

v.

AMSTAR CORPORATION et al., Defendants.

OWEN & MOWREY, INC., Plaintiff,

v.

AMSTAR CORPORATION et al., Defendants.

LUIGI'S TRATTORIA, INC., (a Pennsylvania Corporation) d/b/a Luigi's, Plaintiff,

v.

AMSTAR CORPORATION et al., Defendants.

MDL No. 201A, Civ. A. Nos. 75–514, 75–3301, 75–2521, 75–2519, 75–2520, 75–2621 and 75–2245.

United States District Court, E. D. Pennsylvania.

Oct. 21, 1976.

Joseph D. Tydings, Danzansky, Dickey, Tydings, Quint & Gordon, Samuel H. Seymour, Seymour & Patton, Washington, D.C., for Owen & Mowrey, Inc., Montelepre Memorial Hospital, Inc., Pascal's Manale Restaurant, Inc., and Leonard Greenberg, d/b/a Food Mart.

Herbert J. Garon, Garon, Brener & McNeely, New Orleans, La., for Owen & Mowrey, Inc., Montelepre Memorial Hospital, Inc., and Pascal's Manale Restaurant, Inc.

David C. Harrison, Philadelphia, Pa., for Luigi's Trattoria, Inc., et al.

Herbert B. Newberg, Mitchell A. Kramer, Kramer & Salus, Philadelphia, Pa., for Milton W. Freedman, et al.

Harvey S. Kronfeld, Philadelphia, Pa., for Stotter & Co., Inc.

Edward Brodsky, Lewis M. Koss, Goldstein, Shames & Hyde, New York City, G.

David Rosenblum, Astor & Weiss, Philadelphia, Pa., for National Sugar Refining Co. and Haven Industries, Inc.

John G. Harkins, Jr., Pepper, Hamilton & Sheetz, Philadelphia, Pa., for Savannah Foods & Industries, Inc.

Robert M. Landis, Dechert, Price & Rhoads, Philadelphia, Pa., for Amstar Corp.

Theodore Flowers, White & Williams, Philadelphia, Pa., for Borden, Inc. & Subsidiaries.

James D. Fornari, Irving R. Segal, Arthur H. Kahn, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Gulf and Western Industries.

Donald Brown, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., Timothy D. Wittlinger, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for Michigan Sugar Co.

S. Gordon Elkins, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Sucrest Corp.

Benjamin M. Quigg, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for CPC Intern., Inc.

M. Robert Gallop, New York City, for Revere Sugar Refinery.

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for Consolidated Food Corp.

## OPINION CONCERNING THE PROPRIETY OF CLASS ACTIONS

CAHN, District Judge.

Before the court are the motions of various plaintiffs pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, for an order determining that certain actions involved in this litigation and commenced on behalf of similarly situated persons and entities should proceed as class actions and, furthermore, that the classes plaintiffs seek to represent should be defined as follows:

I. *Class One*—consisting of all persons or private entities doing business as industrial sugar users[1] in 25 Eastern States[2] and in the District of Columbia who have purchased sugar in this Eastern market from a date uncertain to the present time;

II. *Class Two*—consisting of all persons or private entities doing business as retail grocers in 25 Eastern states and in the District of Columbia who have purchased refined sugar in this Eastern market for resale from sometime before 1970 to the present time;

III. *Class Three*—consisting of all persons or private entities doing business as institutional users in 25 Eastern states and in the District of Columbia who have purchased refined sugar in this Eastern market from sometime before 1970 to the present date; and

IV. *Class Four*—consisting of all persons or private entities doing business as wholesalers in 25 Eastern states and in the District of Columbia who have purchased from defendants directly refined sugar, or food products or beverages containing refined sugar, in this Eastern market for distribution from sometime before 1970 to the present time.[3]

Moreover, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, all plaintiffs jointly move this Court for an order dismissing all the counterclaims insti-

---

1. Concerning the industrial sugar users class, such persons or private entities must have purchased refined sugar for use or incorporation in producing, manufacturing or processing foodstuffs and beverages for human or animal consumption, and must not have offered such sugar for resale as sugar.

2. With the District of Columbia, these states comprise the Eastern market for all classes.

3. Excluded from these four classes are (a) the defendants, their subsidiaries and affiliated business entities, (b) members of the public who purchased sugar for nonbusiness use, (c) governmental entities, and (d) each plaintiff who has instituted and presently is maintaining his or its own nonclass action.

tuted by defendant Amstar Corporation[4] in all actions because they fail to state a claim upon which relief can be granted. An additional ground asserted by all plaintiffs for dismissing some counterclaims is predicated upon Rule 9(b) of the Federal Rules of Civil Procedure because it is alleged that the three counterclaims averring fraud have not been stated with particularity.

Finally, certain defendants move this Court for summary judgment in those actions in which plaintiffs claim to be indirect purchasers of refined sugar because they lack standing to sue. Because a consideration and decision relative to these latter two motions is intrinsically intertwined with that of the class action motion, this opinion shall embody a discussion of all three motions.

Therefore, upon an examination of the motions, the supporting and opposing briefs, affidavits and exhibits submitted to this Court by plaintiffs and defendants, and after consideration of the oral arguments presented to this Court by the parties on these matters, all, but plaintiff Stotter's, class action motions are granted with appropriate modifications. These plaintiff classes, represented by plaintiffs and their counsel, as illustrated in Appendix A, which follows this opinion and is incorporated herein by reference, shall proceed as class actions pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. Similarly, plaintiffs' joint motion to dismiss defendant Amstar's counterclaims is granted in part and denied in part. Lastly, certain defendants' motion for summary judgment in those actions where plaintiffs claim to be indirect purchasers of refined sugar because they lack standing to sue is granted in part and denied in part.

## I. FACTUAL BACKGROUND

Initially, because certain terminology descriptive of products, operators, economics and markets either wholly or partially unique to the sugar industry will be utilized in this opinion, the following definitions are included:

(a) "refined sugar" means any grade, type or form of saccharine product derived from the processing of sugar beets or in the refining of raw cane sugar, which contains sucrose, dextrose or levulose;

(b) "refiner" means any company engaged in the processing of sugar beets or in the refining of raw cane sugar into, and the sale of, refined sugar;

(c) "basis price" means the list price of refined sugar sold by a refiner f. o. b. its refinery or processing factory;

(d) "prepaid freight application," commonly known as a "prepay," means a portion of the delivered price for refining sugar equal in amount to a freight charge from a basing point to the customer's location;

(e) "delivered price" means the price of refined sugar delivered to the customer and generally consists of the basis price plus the prepaid freight application;

(f) "allowance" means a discount from the delivered price;

(g) "effective selling price" means the price actually charged to the customer by the refiner and generally consists of the delivered price, less any allowance;

(h) "retail grocer" means any person or entity who purchased during the relevant times hereto refined sugar for the eventual resale of such sugar as sugar for use or incorporation by the consumer in a variety of foodstuffs or beverages for human or animal consumption;

(i) "industrial user" means any person or entity who purchased during the relevant times hereto refined sugar for use or incorporation in the production, manufacture or processing of a variety of foodstuffs or beverages for human or animal consumption, and who did not offer such sugar for eventual resale as sugar;

(j) "institutional user" means any restaurant, airline, hotel, hospital, school, fast-food chain, drinking establishment or other similar institution which purchased refined sugar for use in the sale of food or beverag-

---

**4.** Hereinafter, defendant Amstar Corporation shall be referred to as "Amstar."

es, or in the dispensing of separately packaged, individual servings of such sugar, all of which were obtained directly or indirectly from refiners both under the refiner's label as well as under the institutional user's private label; and

(k) the "market" means collectively the states of Maine, Vermont, New Hampshire, Rhode Island, Massachusetts, Connecticut, New York, Pennsylvania, New Jersey, Delaware, Maryland, West Virginia, Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Arkansas, Tennessee, Kentucky, Ohio and Michigan.

\* \* \*

The following brief sketch of the massive sugar industry is derived from the as of yet unpublished opinion of the Honorable George H. Boldt (MDL Docket No. 201, N.D.Cal., May 20, 1976) dealing with class action determinations.[5] Refined sugar is made by processing sugar beets or by refining raw cane sugar that is derived from crushed sugar cane. Beet sugar is produced in a single process from sugar beets grown in temperate climates throughout the world. Because it is not economical to transport the bulky sugar beets to distant factories, most beet processing plants are located near beet farming areas and operate for four or five months until the crop is processed completely. In parts of California, however, sugar beets are harvested over longer periods of time and the processing plants may run almost all year. To produce cane sugar, which is grown in tropical climates outside the United States and also in Florida, Louisiana, Hawaii and Puerto Rico, sugar cane is ground into raw sugar at nearby grinding mills that operate seasonally. Thereafter, raw sugar is shipped to cane refineries normally located near seaports, which operate throughout the year by obtaining their raw sugar from various cane growing areas throughout the world having different harvest seasons.

Thus, although pure refined beet and cane sugar are identical chemically, the difference in both technology and organization results in two separate products from the standpoint of industry economics. For reasons related in part to the sources of raw materials and to transportation costs, beet sugar and Hawaiian cane sugar products tend to predominate in the Western portion of the United States, and cane sugar from foreign sources and the Gulf Coast states tend to predominate in the Eastern and Southern portions of this nation. Despite this divergence in predominance, grocery customers in many market areas have a preference for cane sugar, which, in turn, supports a price premium for it over beet sugar in grocery product form. Many industrial users, however, consider the two types of sugar interchangeable.

Refined sugar, whether derived from cane or beets, is produced and sold regularly in at least one of three basic grades and forms: granulated sugar packaged and sold in bags or cartons, granulated sugar sold in bulk truck or rail car quantities, and liquid sugar.

There exist two types of refined sugar— "grocery sugar" and "industrial sugar." Grocery sugar is commonly, but not universally, defined as granulated, brown and powdered sugar marketed in 25 pound bags or less, cube sugar, and all private label sugar. This type of sugar is sold to grocery wholesalers and retailers for eventual resale to consumers. Approximately 22 percent of the refined sugar consumed in the United States is sold as grocery sugar. Within the grocery sugar classification, there is "refiner label sugar" and "private label sugar." Refiner label sugar is refined grocery sugar produced and packaged by a refiner and later distributed and marketed under that refiner's brand name. Private label sugar is refined grocery sugar produced and packaged by a refiner, but subsequently distributed and sold under the private brand name

---

**5.** Judge Boldt is the transferee judge pursuant to 28 U.S.C. § 1407, of certain private civil antitrust actions filed against certain western defendants who market, refine or process sugar

in the western United States. *See In re Sugar Industry Antitrust Litigation,* 395 F.Supp. 1271 (J.P.M.D.L.1975).

of a purchaser, who is usually a grocery chain or a buying cooperative, without revealing the identity of the refiner. Some retail grocers even offer private label sugar in competition with refiner label sugar. There is no qualitative distinction between the refined sugar sold under a refiner's own brand and the refined sugar sold under a purchaser's private label. Generally, however, private label sugar sells for less than the refiner's brand at both wholesale and retail levels.

Industrial sugar is considered to be all granulated refined sugar that is marketed in bulk or in 100 pound bags, all liquid sugar, and all bottlers sugar, canners sugar and bakers superfine. Such sugar is sold in liquid or dry form in bag or bulk containers to firms engaged in the preparation and manufacture of food, beverages and agricultural products. Almost all the remaining 78 per cent not marketed as grocery sugar is utilized as industrial sugar.

Refined sugar is consumed or supplied generally by manufacturers and processors of food, beverages and desserts, and by canners, brewers, packers, bakeries, dairies, delicatessens, restaurants and vendors. Some commodities in which refined sugar is employed are bottled and canned fruit and soft drinks, fruit juices, flavorings, extracts, syrups, toppings, malt liquors, confectionaries, chocolate and cocoa products, chewing gum, creamery butter, natural and processed cheese, condensed and evaporated milk, fluid milk, ice cream, frozen desserts, some other dairy products, canned specialties, frozen and unfrozen fruits and vegetables, dehydrated food products, pickles, sauces, salad dressings, flour, cereals, some other grain mill products, animal and fowl prepared feeds and cereals, blended and prepared flour products, bread, cakes, cookies, caramel corn, crackers and other related bakery products. While fungible, refined sugar often is not interchangeable easily. For example, refined sugar in liquid form particularly is desirable and it easily is used in certain industries. Dry granulated sugar can be sold to food processors in bulk or in 100 pound bags. A processor, however, must install special facilities to purchase in dry bulk or liquid. When an industrial user installs facilities within its plant enabling it to use liquid sugar or dry bulk as opposed to bagged sugar, it is precluded as a practical matter from using sugar in other forms and, in any event, it has an economic incentive to avoid those other forms. An industrial user equipped to utilize dry bulk granulated sugar cannot use liquid sugar in its bulk system; a canner normally will have no demand whatsoever for bakers superfine sugar; and a bottler usually has no need for brown sugar, powdered sugar, or canners sugar.

The basic pricing unit for all refined sugar appears to be fine granulated sugar shipped in 100 pound paper bags. Refined sugar may be sold "price date of purchase" or "price date of shipment," that is, at the market price negotiated at either the dates of purchase or shipment. It often is sold pursuant to contracts for an established term of 30, 60 or 90 days, six months, or even a year. Such contracts, in turn, may be for an established price or may be subject to downward "protection," which means that the refiner agrees to bear the risk of a decline in the price of sugar for a specific number of days after the customer has received the sugar. Refined sugar may be marketed on bid for any of the above combinations or may be subject to "most favored customer" provisions. Some refined sugar is manufactured by sugar cane refiners for customers on a "tolling basis," whereby the customer purchases raw sugar, then the sugar cane refiner refines it for a monetary fee or has an agreement that is the economic equivalent of a fee. Also, refined sugar may be sold for so many "points over," that is, a specific number of cents per hundredweight over the New York or another raw cane sugar price. There may even be "points under" contracts, whereby private label sugar is sold at a specific margin below brand sugar products. As can be observed, the variations in the manner in which refined sugar is prices are limited only by the ingenuity of the purchasers and sellers in striking their bargains, and it varies among pur-

chasers, producers and regions for each of the sundry types, grades and packaging available.

Various allowances, discounts or price concessions are often given by refiners. A purchaser may bargain for and receive longer periods within which it can receive a "prompt payment" discount. If a purchaser can haul its own sugar, it may be able to bargain for and receive a "hauling allowance" from a factory or warehouse related to the transportation savings. Customers with rail siding or other facilities that enable them to accept rail carload lots may receive a "direct shipment allowance." Some buyers may bargain for and receive special price concessions called "competitive allowances."

Finally, refiners may sell either f. o. b. their plants, on the basis of a delivered price, on the basis of prepaid freight applications, or on the basis of a "zone price," which is a fixed delivered price applicable in a certain geographic area. Some prepays are based upon the seller's actual freight, while others reflect transportation costs from the nearest sugar cane refining port of entry to meet that competition. All of the above may differ for a particular refiner depending on the time period and the market.

Purchasers of refined sugar can and do purchase their sugar requirements through a variety of distribution channels. Some purchasers buy directly from the refiners. Of those, some may negotiate directly with the refiner or with a broker. A broker may be either a "general broker," handling the sugar of many refiners, an "exclusive broker," handling only one refiner's sugar, or a broker handling a few refiners' sugars or several refiners' sugars in separate markets. Other purchasers customarily buy indirectly through a variety of sources: industrial users from sugar dealers or jobbers; retail grocers from wholesale grocers or from co-operatives; or institutional users from sugar dealers or "full Line" food job-bers that carry a complete line of various products needed by the particular institution.

## II. PROCEDURAL BACKGROUND

The private civil litigation denominated *In re Sugar Industry Antitrust Litigation* had its genesis in certain Government criminal and civil injunctive actions filed in the Northern District of California. A complete history of the western phase of this matter is set forth in Judge Boldt's opinion, *supra*, granting class action status in those cases.

The eastern phase of this litigation, also denominated as *In re Sugar Industry Antitrust Litigation*, was established by the Judicial Panel on Multi-District Litigation [6] in the Eastern District of Pennsylvania and assigned to this Court for coordinated and consolidated pretrial activities pursuant to 28 U.S.C. § 1407. *In re Sugar Industry Antitrust Litigation*, 399 F.Supp. 1397 (J.P.M.D.L.1975); 405 F.Supp. 1404 (J.P.M.D.L. 1975). Briefly, the Panel found that there existed a substantial dichotomy in the sugar industry between the East and the West Coasts in terms of defendants, market areas, and economic and conspiratorial issues to justify bifurcated pretrial processing. The Panel adopted a proposal of the plaintiffs in *Freedman v. Amalgamated Sugar Co.*, Civil Action No. 75–514 (E.D.Pa. filed Feb. 21, 1975), whereby plaintiffs would dismiss their claims against the western defendants, except Amstar, which operates on both the east and west coasts, and amend the class allegation to include only commercial sugar purchasers in the eastern portion of the United States on the condition that the claims against the eastern defendants be allowed to remain in the Eastern District of Pennsylvania. Moreover, plaintiffs stated that they would not initiate discovery against any of the solely western defendants or their employees, with the exception of individuals who once worked for an eastern defendant during the

---

6. Hereinafter, the Judicial Panel on Multidistrict Litigation shall be referred to as the "Panel."

alleged conspiracy and who now are employed by a western defendant. As a result of the formation of this eastern litigation, additional separate actions pending in other districts have been transferred by the Panel to the Eastern District of Pennsylvania for Section 1407 treatment with the actions pending in this forum. The eastern phase of this litigation has been designated as MDL–201A.

The plaintiffs in the eastern lawsuits, seven of which are before this Court for class action certification, consist of various industrial and institutional users, wholesalers and retail grocers, many of whom are suing individually as well as on behalf of others similarly situated. The principal defendants in these lawsuits are Amstar, Borden, Inc. (including its subsidiaries Colonial Sugar Company, North American Sugar Industries, Industrial Sugars, Inc., and Florida Sugar Refinery, Inc.), CPC International, Inc., Michigan Sugar Company, National Home Products Corporation, The National Sugar Refining Co. (now known as RSD Projects, Inc.), Savannah Foods & Industries, Inc., and Sucrest Corporation.[7] Except for National Home,[7.1] these defendants are engaged in the production and sale of refined sugar. Furthermore, various corporations, firms and individuals not named as defendants in these complaints are designated as co-conspirators who participated in the violations alleged therein, and who performed acts and made statements in furtherance of the averred combinations and conspiracies. It is to this litigation, MDL–201A, that attention is focused in this opinion.

Jurisdiction for these lawsuits is predicated upon Sections Four, Twelve and Sixteen of the Clayton Act (15 U.S.C. §§ 15, 22 and 26), "Interstate Commerce Commission orders" jurisdiction (28 U.S.C. § 1336), and "regulation of commerce" jurisdiction (28 U.S.C. § 1337). In addition, venue is based upon Section Twelve of the Clayton Act (15 U.S.C. § 22), and provisions of the general venue section (28 U.S.C. § 1391(b) and (c)).

Generally, the complaints in the actions to which this opinion relates contain allegations that during the relevant period hereto the sugar cane refineries and sugar beet processing factories of the defendants and their co-conspirators were located in the various states of the United States, and that substantial quantities of the sugar refined and processed at those refineries and factories were marketed and shipped interstate to customers located throughout the sugar market. Moreover, the complaints aver that there was a substantial and continuous flow of refined sugar in interstate commerce from the sugar cane refineries and sugar beet processing factories of the defendants and their co-conspirators to their customers.

Predicated upon these preliminary allegations, plaintiffs proceed further and charge that the defendants and their co-conspirators engaged in a combination and conspiracy to restrain unreasonably the aforementioned interstate trade and commerce in violation of Sections One and Three of the Sherman Act (15 U.S.C. §§ 1 and 3). This combination and conspiracy, plaintiffs charge, consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators (1) to establish and raise the basis prices for refined sugar, (2) to establish prepaid freight applications, (3) to eliminate, reduce and restrain the providing of allowances to customers for refined sugar, (4) to establish, raise, maintain and stabilize the effective selling prices for refined sugar, (5) to eliminate, reduce and restrain

---

**7.** Hereinafter, these defendants shall be referred to as "Borden," "Colonial," "North American," "Industrial," "Florida," "CPC," "Michigan," "National Home," "National Sugar," "Savannah" and "Sucrest."

**7.1** At this time, defendant National Home's status is unclear. Plaintiffs claim that this defendant is a sugar refiner, whereas defendant Na-

tional Home contends that it is nothing more than a packager of refined sugar obtained from other sugar refiners. Currently, there is a motion for summary judgment before this Court by defendant National Home seeking to dismiss it as a defendant. Additional discovery is necessary to resolve that issue, and it will not be decided within the confines of this opinion.

off-list pricing in the sale of refined sugar, and (6) to establish list pricing for refined sugar. As a consequence of these allegations, these cases deal with every separate sugar product from liquid to powered and every method of marketing refined sugar from multiple 180,000 pound bulk carload lots to one teaspoonful individual restaurant packets. Every level and method of distribution is present, from companies who purchase directly or indirectly from refineries, wholesalers and through brokers, to grocery retailers.

In formulating and effectuating their combination and conspiracy to restrain trade, it is alleged that defendants and their co-conspirators combined and conspired to do, *inter alia,* the following:

(1) caused brokers and other third-parties to disseminate and communicate among refiners of refined sugar price information and assurances regarding defendants' concerted actions in establishing and stabilizing refined sugar prices;

(2) discussed data and entered into agreements concerning the computation and utilization of prepaid freight applications based on artificial basing points with the purpose and effect of establishing and maintaining uniform prepays and prices for refined sugar; and

(3) published and otherwise disseminated among refiners base point pricing lists and prepay tables in accordance with agreements previously reached.

The plaintiffs also charge that the effects of the alleged combination and conspiracy have been, are and continue to be as follows:

(1) to raise, establish, stabilize and maintain prices for refined sugar at uniform, artificially increased and noncompetitive levels, which have required the public to pay higher prices for refined sugar than it would otherwise have paid;

(2) to deprive purchasers of refined sugar of the benefit of price competition in an unmanipulated, competitive refined sugar market; and

(3) to restrain, restrict, suppress and substantially lessen competition between and among defendants and their coconspirators.

As relief for these claimed violations of the federal antitrust laws, and pursuant to Sections Four and Sixteen of the Clayton Act (15 U.S.C. §§ 15 and 26), plaintiffs seek the following from defendants, both individually and *in solido:*

(1) treble compensatory damages for defendants' unlawful conduct violative of Sections One and Three of the Sherman Act (15 U.S.C. §§ 1 and 3);

(2) that defendants and their subsidiaries, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, be enjoined from directly or indirectly continuing, maintaining or renewing the alleged combination and conspiracy, engaging in any other combination or conspiracy having a similar purpose or effect, or adopting any practice, plan, program or device having a similar purpose or effect; and

(3) costs, expenses and reasonable attorneys' fees.

## III. CLASS ACTION CERTIFICATIONS

### A. *Rule 23(a) Requirements*

Rule 23 of the Federal Rules of Civil Procedure requires this Court to find that all the mandatory requirements enumerated in subdivision (a) of that Rule—numerosity, commonality, typicality and representativeness—have been satisfied by the party or parties moving for such a determination. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir. 1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Katz v. Carte Blanche Corporation,* 496 F.2d 747 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1975); *Chevalier v. Baird Savings Association,* 72 F.R.D. 140 (E.D.Pa.1976); *Sommers v. Abraham Lincoln Federal Savings & L. Ass'n.,* 66 F.R.D. 581 (E.D.Pa. 1975). Therefore, each of the foregoing requirements will be examined as it relates to the within case.

### 1. "Numerosity"

■ Plaintiffs must demonstrate only that "the class is so numerous that joinder of all members is impracticable." *Jones v. United Gas Improvement Corp.,* 68 F.R.D. 1 (E.D.Pa.1975); *Aamco Automatic Transmissions, Inc. v. Tayloe,* 67 F.R.D. 440 (E.D.Pa. 1975); *Buckles v. Weinberger,* 387 F.Supp. 328 (E.D.Pa.1974); Fed.R.Civ.P. 23(a)(1). In the instant matter, all the litigants agree that joinder of all potential plaintiffs is impractical. Even if joinder was possible, such a technique would be both impractical, because there exist well into the thousands certain potential class members dispersed throughout the eastern portion of the United States, and inequitable, because many of these possible class members may have relatively small claims against defendants that will preclude their joinder in an economic sense. A survey of the various putative class actions illustrates their scope in terms of class members:

#### Number of Potential Class Members

| Class | Number | |
|---|---|---|
| I. Industrial Users Class [8] | 7,454 | |
| II. Institutional Users Class [9] | 97,505 | Restaurants |
| | 3,612 | Hospitals/ Health Care Centers |
| III. Retail Grocers Class [10] | 92,990 | |
| IV. Wholesalers Class | Unknown | |

■■ Moreover, the fact that the precise number of potential members in these classes may vary somewhat and, hence, cannot be ascertained with certainty does not bar the certification of various class actions. *Albertson's, Inc., v. Amalgamated Sugar Co.,* 62 F.R.D. 43 (D.Utah 1973), *modified,* 503 F.2d 459 (10th Cir. 1974); *Management*

*Television Systems, Inc. v. National Football League,* 52 F.R.D. 162 (E.D.Pa.1971). As the court noted in *Herbst v. Able,* 45 F.R.D. 451 (S.D.N.Y.1968), involving a securities fraud dispute, there is no need to state the exact number and identity of every possible class member because to do so would frustrate the purpose of class actions when recoveries may be numerous but small. Based upon the current number of potential plaintiffs involved in these class actions, there appears to be ample justification for the view that the present litigation meets the "numerosity" requirement because joinder of these individuals and entities is impracticable.

### 2. "Commonality"

■■ The second prerequisite is the existence of questions of law and fact common to the putative class members. *Philadelphia Electric Co. v. Anaconda American Brass Co.,* 43 F.R.D. 452 (E.D.Pa.1968); Fed.R.Civ.P. 23(a)(2). This requirement is present. Antitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy. *Iowa v. Union Asphalt & Roadoils, Inc.,* 281 F.Supp. 391 (S.D.Iowa 1968), *aff'd,* 409 F.2d 1239 (8th Cir. 1969); *In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269 (D.D.C.1972); *Minnesota v. United States Steel Corp.,* 44 F.R.D. 559 (D.Minn.1968). As a consequence, the following common issues of law and fact that focus upon defendants' alleged price-fixing conspiracy are:

(a) whether defendants combined and conspired to establish artificially the basis price and effective selling price of refined sugar;

**8.** U. S. Dept. of Commerce, Social and Economic Statistic Administration, Bureau of Census, *1972 Census of Manufacturers,* Table Two.

**9.** U. S. Dept. of Commerce, Social and Economic Statistic Administration, Bureau of Census, *1972 Census of Retail Trade,* Table Five; and

the American Hospital Association's Annual Directory, Guide to the Health Care Field, 1974 Edition.

**10.** U. S. Dept. of Commerce, Social and Economic Statistic Administration, Bureau of Census, *1972 Census of Retail Trade,* Table Five.

(b) whether defendants combined and conspired to establish artificially prepaid freight applications for refined sugar;

(c) whether defendants combined and conspired to eliminate, reduce and prevent the granting of allowances to customers of refined sugar;

(d) whether the basis price and the effective selling price for refined sugar were increased artificially by defendants;

(e) whether the prepaid freight applications for refined sugar were established artificially by defendants;

(f) whether defendants actually eliminated, reduced or prevented the granting of allowances to customers of refined sugar; and

(g) the effect upon the market generally by these variously alleged combinations and conspiracies.

These facts, if proven by plaintiffs, will assist in establishing both defendants' conspiracy and the effect thereof on the market.

3. "Typicality"

■ The third prerequisite of Rule 23(a) is met because the claims and defenses of the representative plaintiffs "are typical of the claims or defenses of the class." *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278 (S.D.N.Y.1971); Fed.R.Civ.P. 23(a)(3). In antitrust disputes "Since the representative parties need prove a conspiracy, its effectuation, and damages therefrom—precisely what the absentees must prove to recover—the representative claims can hardly be considered atypical." *Minnesota v. United States Steel Corp., supra,* at page 567. The claims of the purported representative parties are co-extensive with those of the potential class members. Each class representative challenges defendants' alleged unlawful anti-competitive activities and, furthermore, seeks monetary recovery for artificially inflated prices related to refined sugar that have been paid by all other similarly situated purchasers. For these reasons, the named plaintiffs who seek to represent certain potential class members have claims against the various defendants

that are typical of those possible class members' charges.

4. "Representativeness"

This Court finds that certain plaintiffs in this litigation are representative parties who will fairly insure the adequate representation of all other unnamed plaintiffs. Fed.R.Civ.P. 23(a)(4). In this Circuit it has been held:

"Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir. 1975), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

Defendants challenge both factors, stating that some of the plaintiffs in this litigation have conflicting interests with the possible class members they desire to represent and, consequently, that these antagonistic interests will prevent plaintiffs from exerting their foremost efforts on behalf of others similarly situated. Because the "representativeness" requirement is one of the most critical factors that must be satisfied before any class action certification can occur, defendants' objections must be examined in depth for substantiality.

(a) *Coincidence of interests between the purported representative parties and the potential class members*

As previously noted, certain defendants have moved to dismiss the claims of five plaintiffs because each is an admitted indirect purchaser of refined sugar and, therefore, they lack standing to sue in this judicial circuit. Hence, because the law in the Third Circuit allegedly provides that only direct purchasers of a product from an alleged price-fixing conspirator may maintain a claim for treble damages, defendants contend that plaintiffs cannot represent other members of the proposed classes fairly and adequately. Defendants basically rely upon *Hanover Shoe, Inc. v. United States Ma-*

chinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Travis v. Fairmount Foods Co.*, 346 F.Supp. 679 (E.D.Pa.1972); [11] and *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 323 F.Supp. 381 (E.D.Pa.1970); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 50 F.R.D. 13 (E.D.Pa.1970), *aff'd sub nom., Mangano v. American Radiator & Standard Sanitary Corp.*, 438 F.2d 1187 (3d Cir. 1971).

The plaintiffs in *Mangano* included a class of homeowners who sought to recover alleged illegal overcharges from the manufacturers who had installed plumbing fixtures during the construction of their houses. After a lengthy series of delays, the plaintiffs filed skeletal and evasive answers to certain interrogatories propounded by the defendants relating to the recovery of damages. The court found that members of the homeowner class had consistently "fail[ed] to provide essential information bearing on defendants' contention that the price charged for a home was in no way governed by the cost of its plumbing fixtures. . . . [or] any information as to the price paid either for the plumbing fixtures or the homes containing them." (Footnote omitted.) 50 F.R.D. at 16. Likewise, the brief answers filed by the plaintiffs failed to provide the total prices paid for the fixtures or any "information as to how the prices they paid for plumbing fixtures or for houses were arrived at, which factor also has important bearing on relative rights of plaintiffs with competing claims." (Footnote omitted.) *Id.* at 16–17.

Judge John Lord concluded that "[i]n light of the flagrant disregard by plaintiffs of the discovery requirements . . . ." he would be justified in dismissing their claims. *Id.* at 18. Instead, however, the court chose a lesser alternative that had the same ultimate effect, and held that

> [P]laintiffs' failure to answer important interrogatories clearly warrants a ruling by the Court that the matters regarding

which those questions were asked be taken to be established in accordance with the claims of defendants. [Citations omitted.] *Id.* at 19.

In particular, the court expressly presumed two dispositive facts against the plaintiffs:

1) That each of the present plaintiffs bought a house containing plumbing fixtures rather than plumbing fixtures as such.

2) That the present plaintiffs did not make their purchases pursuant to a preexisting cost-plus contract or analogous fixed markup type of arrangement. *Id.* at 19.

Additionally, the Court determined that the right of each plaintiff to recover damages was dependent upon the following premises:

1) When the wholesaler purchased the plumbing fixtures ultimately used in the construction of that plaintiff's house, the price paid included an unlawful overcharge.

2) When the wholesaler sold those plumbing fixtures to the plumbing contractor, it passed on the overcharge to the latter.

3) When the plumbing contractor sold those plumbing fixtures to the builder who constructed plaintiff's home, it passed on the overcharge to the builder.

4) When the builder incorporated those plumbing fixtures in the home it constructed, it passed on the overcharge to the purchasing homeowner.

5) Where the plaintiff homeowner bought his home from a prior homeowner, that such prior homeowner passed the overcharge on to the plaintiff. *Id.* at 19–20.

Having established this factual record, Judge Lord undertook an extensive review and analysis of the "passing-on" and standing issues in antitrust price-fixing cases, devoting particular attention to the landmark decision in *Hanover Shoe, Inc. v.*

---

**11.** In *Travis, supra,* plaintiffs merely conceded that the law precluded their recovery of damages under Section Four of the Clayton Act.

*United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe,* the defendant had established a virtual monopoly of the market in shoe machinery. The district court held that the defendant had used its monopoly position in the market to impose a lease-only policy upon its customers and to charge them higher effective prices for the use of shoe machinery than they would have paid had it sold them the machines in open competition. The plaintiff, a customer of defendant and a manufacturer of shoes, sued for treble damages under Section Four of the Clayton Act, alleging a violation of Section Two of the Sherman Act. The defendant contended that plaintiff had not suffered injury within the terms of Section Four because it had passed on any overcharge in the form of higher prices for its shoes. The lower courts rejected this defense and the Supreme Court affirmed.

In *Hanover Shoe,* the Supreme Court held (in language later quoted and relied upon by the district court in *Mangano*):

A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable. 392 U.S. at 492–93, 88 S.Ct. at 2231 (Footnote omitted.)

Following a comprehensive analysis, Judge Lord concluded that the *Hanover Shoe* rationale applies not only to bar a defendant's use of a pass-on defense to a direct purchaser's claim, but also to bar the indirect purchaser claimant who confronts many of the same problems of proof that are an integral element of his affirmative claim. Applying the *Hanover Shoe* rationale in *Mangano,* Judge Lord found that as a matter of law the homeowner plaintiffs were too remote in the chain of distribution to recover damages as a result of the alleged illegal overcharges on the plumbing fixtures used in the construction of their homes. As already noted, the plaintiffs had been unable or unwilling to provide *any* information as to the prices they had paid for the plumbing fixtures. Moreover, as Judge Lord observed, many of the complex economic "tracing" problems recounted in *Hanover Shoe* were present in *Mangano* because the plaintiffs there had purchased houses, and not plumbing fixtures as such. In affirming Judge Lord's holding, the Third Circuit stated:

*In these circumstances,* the district court was justified in concluding that these plaintiffs were faced with the "insuperable difficulty," spoken of by the Supreme Court in the *Hanover* case, of demonstrating that any manufacturer's overcharge was a *causa sine qua non* of any payment any of them had to make. 438 F.2d at 1188 (Emphasis added and supplied to first line.)

This Court, of course, is aware of the rather lukewarm reception that has been accorded *Mangano.*[12] Nevertheless, little or

---

12. *See, e. g., Illinois v. Ampress Brick Co., Inc.,* 536 F.2d 1163 (7th Cir. 1976); *In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir.

no purpose would be accomplished if this Court were to re-evaluate the authorities relied upon, or the conclusions drawn therefrom, by the district court in *Mangano.* Judge Lord's decision was affirmed by the United States Court of Appeals for the Third Circuit, and it is thus binding on this Court. *See, e. g., Minersville Coal Co. v. Anthracite Export Ass'n,* 335 F.Supp. 360, 365 (M.D.Pa.1971). Thus, the only issue is whether, given the record before this Court, the named plaintiff in the *Luigi's, Montelepre, Greenberg, Pascal's* and *Stotter* actions "are, as in *Mangano,* too remotely placed in the chain of the distribution . . to be permitted to recover as a matter of substantive law." *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 323 F.Supp. 381, 384 (E.D.Pa.1970).

■ It appears to this Court that there is a fundamental distinction to be drawn between the factual settings in *Luigi's, Montelepre, Greenberg* and *Pascal's* and that in *Mangano.* Unlike the plaintiffs in *Mangano,* who were denied standing to sue for overcharges on plumbing fixtures that had passed through three or four prior levels of distribution before being incorporated as a minor component in their houses, plaintiffs herein bought the price-fixed item itself through a wholesaler or similar middleman. There is no question here that the sugar was not a component part of anything else. The effects of the price-fixing on the refinery level were not obscured by the sugar's having passed through any other product market. *See In re Antibiotic Antitrust Actions,* 333 F.Supp. 310, 312 (S.D.N.Y.1971). This distinction has been recognized in a number of decisions rendered since *Mangano. See, e. g., In re Plywood Antitrust Litigation,* 1976–1 Trade Cas. ¶ 60,805 (E.D. La.1976); *Stern v. Lucy Webb Hayes Nat. Train. Sch. for Deacon. and M.,* 367 F.Supp. 536, 539 (D.D.C.1973); *Illinois v. Ampress Brick Co., Inc.,* 67 F.R.D. 461, 466–67, *rev'd*

on other grounds, 536 F.2d 1163 (7th Cir. 1976); *Bill Minnielli Cement Contr., Inc. v. Richter Concrete Corp.,* 62 F.R.D. 381, 389 (S.D.Ohio 1973); *Boshes v. General Motors Corp.,* 59 F.R.D. 589, 597 (N.D.Ill.1973). In *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 323 F.Supp. 381 (E.D.Pa.1970), another plumbing fixture antitrust action and a decision relied upon by defendants in this litigation, the court was careful to point out that the "plaintiffs contracted not for the purchase of plumbing fixtures themselves but for the purchase of public buildings containing plumbing fixtures." *Id.* at 385. Moreover the court in that decision concluded that:

> [w]hether other plaintiffs at different levels of the chain of distribution are similarly foreclosed from asserting their claims must necessarily depend upon the particular facts pertaining to such plaintiffs' purchase of the . . . structures that incorporate such plumbing fixtures. *Id.* at 387.

And, as the court held in *Boshes, supra*:

> Unlike the *Mangano* case, the fact-finder here would not be required to trace an overcharge from manufacturer to wholesaler to contractor to homebuilder to ultimate home purchaser (consumer). In this case, the product that leaves the manufacturer reaches the ultimate purchaser in the same form, and not merely as a small component or derivative of something else. Hence, many of the economic conversion factors eschewed in *Hanover Shoe* are absent here and will not, therefore, render proof of damages, at least in each individual case, an "insurmountable task". 59 F.R.D. at 597.

■ When an allegedly price-fixed product passes through various product markets in different forms, this Court has no doubt that the possibility of proving the causal connection between the antitrust violation

1973), *cert. denied sub nom. Standard Oil Co. v. Alaska,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974); *Carnivale Bag Co., Inc. v. Slide-Rite Mfg. Corp.,* 395 F.Supp. 289 (S.D.N.Y. 1975); *In re Master Key Antitrust Litigation,* 1973–2 Trade Cas. ¶ 74,680 (D.Conn.1973); *Mangano and Ultimate-Consumer Standing: The Misuse of the Hanover Doctrine,* 72 Col.L. Rev. 394 (1972).

and the price ultimately paid for the product may be found to be so remote in a given case that standing should be denied. *See Mangano, supra; In re Antibiotic Antitrust Actions, supra.* In the *Luigi's, Montelepre, Greenberg* and *Pascal's* actions, however, where the allegedly price-fixed commodity reached plaintiffs in the same form that it left the hands of the defendant, this Court is convinced that, as a matter of law, plaintiffs should be given an opportunity to present evidence in support of their allegations. The "insuperable difficulties" found to exist in *Hanover Shoe* and *Mangano* are not apparent in the record before this Court.

Finally, defendants argue that Judge Lord absolutely ruled in *Mangano* that only the first consumers in a chain of distribution may sue under Section Four of the Clayton Act. *See Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 50 F.R.D. at 29–31. A careful reading of Judge Lord's opinion reveals that his concern over expanding the scope of standing under Section Four was premised in great part on the belief that such an expansion might permit a "double (treble-) recovery of the same loss" if "remote purchasers" were allowed to sue. 50 F.R.D. at 30. Judge Lord also stated:

> It is also noteworthy that plaintiffs have not cited to the Court, nor has the Court discovered in its own research, a single case which has allowed the types of claims here asserted by plaintiffs. *Id.*

*See also Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 323 F.Supp. at 383–84.

Initially, it should be noted that in this litigation there is as yet no danger of a double recovery of damages. This litigation has been pending for nearly a year, and no purchaser situated more remotely in the chain of distribution of refined sugar than plaintiffs in *Luigi's, Montelepre, Greenberg* and *Pascal's* has commenced an action against the defendants. Moreover, several courts have recently considered and, to this Court's satisfaction at this stage of the proceedings, resolved the problem of duplicative liability and damages. *See In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir. 1973), *cert. denied, sub. nom. Standard Oil Co. v. Alaska,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974); *Carnivale Bag Co., Inc. v. Slide-Rite Mfg. Corp.,* 395 F.Supp. 287 (S.D.N.Y.1975); *In re Master Key Antitrust Litigation,* 1973–2 Trade Cas. ¶ 74,680 (D.Conn.1973); *Boshes v. General Motors Corp.,* 59 F.R.D. 589 (N.D.Ill.1973). This Court is convinced that, should the issue of double recovery of damages ever arise in this litigation, it can apportion damages on an equitable and accurate basis with the assistance and cooperation of the extremely capable counsel involved in these actions.

■ This Court's resolution of the standing issue in *Luigi's, Montelepre, Greenberg* and *Pascal's,* together with the continued vitality of *Mangano* in this Circuit, should make it obvious that plaintiff Stotter & Co., Inc. does not have standing to bring an action under Section Four of the Clayton Act. Unlike the other named plaintiffs whose standing has been challenged, plaintiff Stotter has purchased only *sugar-containing* products.[13] Although some courts have argued persuasively that an "ultimate" consumer such as Stotter should have standing under Section Four,[14] this Court is unable to distinguish the *Stotter* action from *Mangano* and must, therefore, rule that as a matter of law plaintiff Stotter is too remote in the chain of distribution of refined sugar to make a claim for alleged overcharges.

---

**13.** Although plaintiff Stotter & Co., Inc. seeks class action certification for a class of persons or private entities doing business in the Eastern Market as wholesalers of refined sugar and as wholesalers of any sugar-containing foodstuffs or beverages, it appears that plaintiff Stotter does not purchase refined sugar as sugar.

**14.** *See, e. g., Illinois v. Ampress Brick Company, Inc.,* 536 F.2d 1163 (7th Cir. 1976); *In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir. 1973), *cert. denied, sub nom. Standard Oil Co. v. Alaska,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974).

(b) *Vigorous prosecution of the class actions by the putative representative parties*

██ The second requirement of "adequate representation"—that the representatives of the putative classes must prosecute vigorously the action—is met for two reasons. First, as just mentioned, the first aspect of adequate representation has been satisfied, which, if it had not been met, would have defeated this second element. Furthermore, the representative plaintiffs have a substantial monetary investment to warrant their prosecution of these actions on behalf of their classes. Regarding the competency of plaintiffs' counsel to conduct the processing of this matter, this Court finds that they are adequate counsel. Among plaintiffs' attorneys are firms who have the principal responsibility of managing several multidistrict antitrust litigations involving class actions, and who have been successful therein. The quality of legal work performed by both plaintiffs' and defendants' counsel in this matter has been outstanding.

It appears at this time that (1) no real conflict of interest exists between any of the plaintiffs and the putative class members, and that (2) plaintiffs are committed to a vigorous prosecution of this matter. Assuming *arguendo* that any of the named plaintiffs or their counsel fail to protect the unnamed class members' interests at any time in the course of these proceedings, they can and will be removed as representatives and, if necessary and possible, will be replaced by others.

\* \* \*

B. *Rule 23(b)(2) Requirements*

Rule 23(b)(2) certification is appropriate if the prerequisites of Rule 23(a) are satisfied and if, in addition, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." Fed.R.Civ.P. 23(b)(2). The Notes of the Advisory Committee to the 1966 amendments to Rule 23 state that "[the] subdivision [23(b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." 39 F.R.D. 69, 102 (1966). This view is reiterated by Professor Moore. 3B J. Moore, Federal Practice ¶ 23.40, at 23–654 (2d ed. 1975). He further states

[s]ubdivision (b)(2) is limited to actions where injunctive or declaratory relief on behalf of the class is the exclusive or predominant final result sought. Thus a request for such a remedy merely in aid of a suit for money damages, . . . would not bring the action within (b)(2). Similarly, where it is clear that the real aim of the litigation is the ultimate money award, with a plea for injunctive relief appended as a formality or a very secondary consideration, the action should be classed within (b)(3). (Footnotes omitted.) 3B J. Moore, Federal Practice ¶ 23.45[1], at 23–708 (2d ed. 1975).

\* \* \* \* \* \*

In most private antitrust suits, injunctive relief is ordinarily of much less concern than the treble damages, to all parties; even where the request for an injunction is sincere, the prospect of damages is so important that injunctive relief would usually not be "predominant." In almost all such situations, the suit should be treated under (b)(3). 3B J. Moore, Federal Practice ¶ 23.45[1], at 23–708 to 09 n. 43 (2d ed. 1975).

This view received support in *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 564 (2d Cir. 1968), wherein certification of a class under 23(b)(2) was denied in favor of certification under 23(b)(3) because the primary claim was for damages. In another case involving a private treble damages antitrust class action, certification under 23(b)(2) was held inappropriate because monetary damages were at least a substantial element of the plaintiffs' claim. The court declared that

It is unnecessary to decide whether the claim for monetary damages or the claim for injunctive relief is primary and the

other ancillary . . . . To the extent that plaintiffs seek treble damages under Section 4 of the Clayton Act, certification of a class under Rule 23(b)(2) would appear to be entirely inappropriate. Section 4 damages can hardly be said to be ancillary to Section 16 injunctive relief under the statutory scheme of the Act. *Bogosian v. Gulf Oil Corp.*, 62 F.R.D. 124, 134 (E.D.Pa.1973).

Certification of a class under 23(b)(2) was declared inappropriate in another antitrust class action because the main import of the action was money damages, though injunctive relief also was requested. *Albertson's Inc. v. Amalgamated Sugar Co.*, 62 F.R.D. 43, 49 (D.Utah 1973), *modified on other grounds*, 503 F.2d 459 (10th Cir. 1974).

▪ Classes that have been certified under Rule 23(b)(2) despite the presence of a claim for monetary relief generally have been brought under the Civil Rights Acts. The primary purpose of these actions has been injunctive relief, damages being an additional equitable remedy in the form of a back-pay award. Courts have held that certification of this type of class under 23(b)(2), with its pointed reference to "injunctive relief or corresponding declaratory relief," does not exclude the possibility of a monetary award to the class. *See Wetzel v. Liberty Mutual Insurance Co., supra; Franks v. Bowman Transportation Co.*, 495 F.2d 398, 421–22 (5th Cir. 1974), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 256–57 (5th Cir. 1974); *Robinson v. Lorillard Corp.*, 444 F.2d 791, 802 (4th Cir. 1971), *cert. denied*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). But treble damages in an antitrust action do not fall into this category (*Sommers v. Abraham Lincoln Federal Savings & Loan Ass'n*, 66 F.R.D. 581, 589–90 (E.D. Pa.1975)), because the damage aspect is such a significant part of these actions that certification under 23(b)(2) would be inappropriate. Therefore, certification for the plaintiff classes in this litigation shall proceed under Rule 23(b)(3) only.

### C. *Rule 23(b)(3) Requirements*

In addition to determining whether the four prerequisites of Rule 23(a) are satisfied, before an action may be maintained as a class action under 23(b)(3), this Court must determine whether plaintiffs have met their burden of establishing that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Katz v. Carte Blanche Corporation*, 496 F.2d 747 (3d Cir. 1974), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); Fed.R. Civ.P. 23(b)(3). Whether these dual requirements of Rule 23(b)(3) have been established is a crucial issue and, therefore, an extended outline of the respective positions of the parties is in order.

#### 1. *"Common Questions of Law or Fact Must Predominate Over Individual Questions"*

Naturally, plaintiffs contend that there are common issues of law and fact which predominate over individual questions because of an alleged broad combination and conspiracy by defendants. Defendants counter this contention by arguing that they did not participate in a combination and conspiracy throughout the relevant period and, even if they did, common factual and legal issues do not predominate simply because plaintiffs aver in their complaints an overall common conspiracy. In short, defendants maintain that this litigation is not one in which plaintiffs charge common defendants with agreeing on a common price-fixing formula to be applied equally with respect to all basis prices, prepaid freight applications, delivered prices, allowances and effective selling prices in the same market to the same purchasers at all times. Because the actual manner in which refined sugar was and is priced varies among periods of time, defendants, localities, sugar products and distribution levels, defendants urge that proof of a particular price change during a specific time period necessarily involves the predominance of

separate factual and legal issues. In addition, defendants argue that even if indirect purchasers, who are the majority of contemplated plaintiff class members, have standing to sue, their presence compounds the inappropriateness of the proposed classes. Defendants maintain that plaintiffs must trace their purchases of refined sugar through the chain of distribution and to establish at each level that the alleged overcharges were not absorbed wholly or partially by someone else, such as a direct purchaser. Plaintiffs may not avoid this individualized issue by resorting to a theory of "fluid recovery",[15] defendants contend, nor by the utilization of a formula of general application because this litigation involves an extensive and individualized form of proof. And because this question is one of "impact," defendants state that plaintiffs must adjudicate it during the liability rather than the damage stage.

Another type of individual factual and legal question that predominates in this litigation centers upon plaintiffs' allegations of fraudulent concealment of the averred conspiracy by defendants. It is defendants' position that plaintiffs must demonstrate individually that defendants fraudulently concealed their activities from each particular plaintiff and, furthermore, that all plaintiffs failed to discover the actual facts upon their exercise of due diligence. Finally, defendants contend that individual factual questions exist because defendant Amstar has instituted counterclaims against plaintiffs and the potential class members they seek to represent.

This Court rejects the foregoing arguments propounded by defendants because of the facts peculiar to this litigation and because of the state of the law at this time. The relationship between the price of beet sugar and cane sugar has been analyzed in Judge Boldt's opinion, *supra,* and by the Tenth Circuit in *Albertson's, Inc. v. Amalgamated Sugar Co.,* 503 F.2d 459, 462 (10th Cir. 1974).

The channels of distribution are uncomplicated because refined sugar is distributed in one of two ways—directly or through wholesalers. About eighty percent of refined sugar is sold to industrial users and retail grocers by defendants themselves or through their brokers, who are, in effect defendants' agents.[16] The brokers receive a set amount per hundredweight, and therefore, their commission is unrelated to the sales price of the sugar products handled. Their services and methods of compensation are identical irrespective of whether they are exclusive or general brokers. The other twenty percent of refined sugar not marketed by defendants or their brokers is sold to wholesalers for resale to industrial and institutional users and retail grocers.

| Direct (80%) | Indirect (20%) |
| --- | --- |
| Refiner-Broker | Refiner-Broker |
| ↓ | ↓ |
| Industrial Users; Retail Grocers | Wholesaler, Jobber, Dealer, Cooperative |
| | ↓ |
| | Industrial Users; Retail Grocers |

Defendants as a group allegedly sold the majority of refined sugar in the market, and therefore, any illegal activities by them would not only affect each company's individual prices, but would tend to stabilize the entire price structure in this market, including sugar products marketed by non-defendant co-conspirators and others. Because the overriding sales factor in a fungible commodity such as sugar is price, a price difference of less than a cent may divert business from one company to another. For any price increase to be effective, all the major companies in an industry must raise their prices simultaneously to the appropriate amount. Any time one seller in-

---

**15.** *See Eisen v. Carlisle & Jacquelin,* 52 F.R.D. 253, 261 (S.D.N.Y.1971).

**16.** The broker is not a separate step in the distribution from refiner to user in direct purchases nor from refiner to wholesaler, jobber, dealer, cooperative in indirect purchases.

Thus, certain affidavits state in substance that purchases from defendants through a broker, whether general, exclusive or general line food, are purchases directly from defendants. When orders are placed with a broker, the invoice comes from the sugar company.

creases prices by raising a basis price or by removing an allowance, it will probably lose business unless all other major competitors undertake the same action. The sales dominance of defendants seems to be so great that it leaves little opportunity for non-defendant sales to vary the commonality of plaintiffs' claims against defendants. In addition, it is alleged that the control of allowances from the basis price was the primary instrument utilized by defendants in stabilizing and increasing prices for sugar products. Allowances generally were given to the largest customers and then spread to other lesser accounts, plaintiffs aver. A conspiracy was designed to facilitate the exchange of price information for the purpose of eliminating concessions or allowances, plaintiffs charge, so that the refined sugar purchasers would be prevented from playing one defendant off against another. Thus, it is averred, defendants implemented this conspiracy from time to time as the need arose to stabilize downward price trends in a particular territory. Normally, price decreases were precipitated by one or more defendants extending concessions or allowances to customers, charge plaintiffs, which would require joint action by all defendants to stabilize the decline and either maintain or increase the price to a level acceptable to defendants. Therefore, it is this alleged horizontal price-fixing arrangement among defendants and others in this single commodity market that comprises the predominant and uniform common question of fact affecting all potential class members.

■■■ Now, this Court turns to the procedural law behind class actions as it relates to federal antitrust litigations. Class certification does not require · that common questions be completely dispositive of a litigation as to all potential members of the class. *Link v. Mercedes-Benz of North America, Inc.,* 1975–2 Trade Cas. ¶ 60,534 (E.D.Pa.1975). Uniformly, courts have rejected arguments that various disparate facts relating to the claims of possible class members preclude the finding that common conspiracy issues predominate. In *City of New York v. General Motors Corp.,* 60

F.R.D. 393, 395 (S.D.N.Y.1973), *appeal dismissed,* 501 F.2d 639 (2d Cir. 1974), the court stated:

> The defendant contends that differences among the class members regarding the manner of purchase and payment; the effect of the alleged monopolization upon physical, economic, environmental and sociological conditions; design specifications and the amounts paid make class action treatment inappropriate in this case. These factors at first blush, seem supportive of the defendant's contention, but on full consideration it becomes clear that each of these local differentiations relates solely or primarily to the question of damages and will be of little or no relevance in determining plaintiff's underlying claims.

It has been held that variations as to the amount of damages incurred by members of the class do not negate certification of the class if common issues are present regarding conspiracy and impact. *In re Master Key Antitrust Litigation,* 1975–1 Trade Cas. ¶ 60,377 (D.Conn.1975); *Iowa v. Union Asphalt & Roadoils, Inc.,* 281 F.Supp. 391 (S.D. Iowa 1968), *aff'd* 409 F.2d 1239 (8th Cir. 1969); *Siegel v. Chicken Delight, Inc.,* 271 F.Supp. 722 (N.D.Cal.1967); *In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269 (D.D. C.1972); *Minnesota v. United States Steel Corp.,* 44 F.R.D. 559 (D.Minn.1968). It is important to consider Judge Blumenfeld's observations on this point in fn. 3 of *In re Master Key Antitrust Litigation,* 1973–2 Trade Cas. ¶ 74,680 (D.Conn.1973):

> The defendants argue that there is no liability without injury, and that a crucial element of the plaintiffs' case will, therefore, be proving damage. The argument continues: as the complexities of showing damage to each plaintiff are involved at the liability stage, it may be seen that common issues do not predominate even as to this portion of the case.
>
> I believe this class defense argument, [citation omitted] to be a red herring, notwithstanding its acceptance by some courts. [Citations omitted.] If the plaintiffs introduce proof (or if it may be

stipulated) at the liability stage that they bought master key systems and that the defendants engaged in a pervasive nationwide course of action that had the effect of stabilizing prices at supracompetitive levels, the jury may conclude that the defendants' conduct caused injury to each plaintiff. The amount of that injury may be computed at a separate trial on the damage issues. [Citations omitted.] From the excerpts of transcripts provided me by the plaintiffs it appears that Judge McGarr has adopted a similar position in the *Automobile Fleet Discount Cases,* M.D.L. No. 65 (N.D.Ill.), as did Judge Sirica in the *Ampicillin Antitrust Litigation,* [1972 Trade Cases § 73,966], 55 F.R.D. 269, 275–76 (D.D.C. 1972).

In deciding the first question of Rule 23(b)(3) of whether common questions of law or fact predominate, the attention of this Court should first be directed to liability issues. *Link v. Mercedes-Benz of North America, Inc., supra.* 3B J. Moore, Federal Practice ¶ 23.45[2] at 23–758 (2 Ed. 1974).

■ The requirement of "predominance" requires only that basic facts and laws predominate; they need not be dispositive of an action. In this litigation, it is the allegedly unlawful horizontal price-fixing arrangement among defendants that, in its broad outlines, comprises the predominating, unifying common interest as to these purported plaintiff representatives and all possible class members. Hence, the existence, implementation and effect of this alleged conspiracy upon refined sugar prices are the central issues for each class proposed. A common thread of evidence is admissable on these elements and will correspond to evidence which otherwise would be introduced by absentee class members. *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791 (10th Cir. 1970); *Research Corp. v. Pfister Associated Growers, Inc.,* 301 F.Supp. 497 (N.D.Ill.1969); *Illinois v. Harper & Row Publishers, Inc.,* 301 F.Supp. 484 (N.D.Ill.1969); *Iowa v. Union Asphalt & Roadoils, Inc., supra; In re Ampicillin Antitrust Litigation, supra; City of Philadelphia v. American Oil Co.,* 53 F.R.D. 45 (D.N.J.

1971); *Sol S. Turnoff Drug Distributors Inc. v. N.V. Nederlandsche, etc.,* 51 F.R.D. 227 (E.D.Pa.1970); *Minnesota v. United States Steel Corp., supra; Philadelphia Electric Co. v. Anaconda American Brass Co., supra.* As Judge Fullam so succinctly noted in the *Philadelphia Electric Co.* dispute:

> In order to succeed in this action, plaintiffs will have to prove (1) that there was a conspiracy to fix prices in violation of the antitrust laws; (2) that prices were fixed pursuant thereto; and (3) that plaintiffs purchased products at prices which, as a result of the conspiracy, were higher than they should have been. All of these issues except the actual purchases by the various plaintiffs seem almost certain to be largely common to the entire class. 43 F.R.D. at 457.

> \*　　\*　　\*　　\*　　\*　　\*

> For obvious reasons, it would be improper for me to pre-judge these key issues. For the same reasons, it cannot be seriously suggested that plaintiffs must prove the conspiracy and all its ramifications before being permitted to maintain a class action. 43 F.R.D. at 458.

#### (a) *The issue of "conspiracy"*

■ If, as plaintiffs allege, the pricing mechanisms utilized by defendants were established conspiratorially, then that conduct is unlawful *per se* under Section One of the Sherman Act. In *Illinois v. Harper & Row Publishers, Inc., supra,* at 488, Judge Decker held:

> The single most important issue is whether the defendants' conspiratorial agreements actually existed. Offering the same facts, all class members will strive to establish a national conspiracy among the publishers. [Footnote omitted.]

■ The same conclusions were reached by Judge Blumenfeld in *In re Master Key Antitrust Litigation, supra,* a case involving a wide variety of contract hardware items marketed through diverse channels and installed in structures, each of which was unique:

It is true, as the defendants urge, that there may be local variations in marketing practices and the like . . . But these facts do not change the central and common element of these cases—the question whether the defendants acted in concert to decrease competition among them. If this element is shown, differences in the way the plan was manifested around the country are unimportant, except perhaps as they may affect the amounts of recovery different plaintiffs may obtain. Nor does this last qualification militate against class certification; in few class actions is there a simple per capita measure of recovery. Here the differences may be due to different conduct of buyers and sellers (as opposed, perhaps, to differences only among buyers in some class actions). But the differences in damage recoveries may be handled by splitting the trial into liability and damage components. . . .

Therefore, defendants' contention is rejected that a separate and distinct analysis of the transactions of each defendant with each class member is required.

(b) *The issue of "impact"*

 In addition, the pleaded facts in this litigation set forth not only the specific overt conspiratorial acts of defendants, but also the effect of such acts on the basic market price structure in the sugar industry. Concentration, fungibility and inelastic demand are characteristics of the market in which potential class members dealt. Those characteristics coupled with alleged industry-wide anticompetitive practices lead to the conclusion that the general impact on, or injury to, the class members, as distinguished from each member's specific dollar damages, is a common and predominant factual issue.

Satisfaction of the impact requirement can be met by evidence that the alleged conspiracy resulted in overcharges that were "passed-on," at least in part, to all claimants. *Perkins v. Standard Oil Co. of California,* 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); *In re Ampicillin Antitrust Litigation, supra; Philadelphia Elec-*

*tric Co. v. Anaconda American Brass Co.,* 43 F.R.D. 452 (E.D.Pa.1968).

Defendants err when they suggest that in any price-fixing action each member of the class must prove that he absorbed at least some portion of the alleged overcharges as an essential liability element before reaching the damage question. In *In re Western Liquid Asphalt Cases, supra* at 200–01, the court stated:

Problems of the apportionment of damages, as between an intermediary and an ultimate consumer, may be treated after liability is established, unless it be clear that no ultimate consumer was damaged. * * * If an illegal overcharge is proved, then the court can inquire whether the intermediaries paid it. If not, then obviously appellants paid it, and should recover. * * * Thus, in passing-on cases, the intermediary should recover the amount of the overcharge that was not passed on, if the proof shows that the ultimate consumers did not pay it at all, and any lost profits resulting from increased costs. The ultimate purchasers should obtain the remainder of the overcharge, and any other damages proximately caused.

 The possibility of a large number of class members does not mean that the impact issue becomes specific, as opposed to general, with each class member. *In re Western Liquid Asphalt Cases, supra; Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir. 1961); *Bray v. Safeway Stores, Inc.,* 392 F.Supp. 851 (C.D.Cal.1975); *Illinois v. Harper & Row Publishers, Inc.,* 301 F.Supp. 484 (N.D.Ill.1969); *Iowa v. Union Asphalt & Roadoils, Inc.,* 281 F.Supp. 391 (S.D.Iowa 1968); *Sommers v. Abraham Lincoln Federal Savings & Loan Ass'n,* 66 F.R.D. 581 (E.D.Pa.1975); *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109 (S.D.N.Y. 1975); *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.,* 64 F.R.D. 35 (S.D.N.Y.1974); *In re Ampicillin Antitrust Litigation, supra; Wainwright v. Kraftco Corp.,* 54 F.R.D. 532 (N.D.Ga.1972); *City of Philadelphia v. American Oil Co., supra; Philadelphia Elec-*

*tric Co. v. Anaconda American Brass Co., supra.* It has been held that impact will be presumed once a plaintiff demonstrates the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices beyond competitive levels. *Richfield Oil Corp. v. Karseal Corp.,* 271 F.2d 709 (9th Cir. 1959), *cert. denied,* 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir. 1964), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp.,* 264 F.2d 602 (9th Cir. 1958). This general standard for proof of impact was set forth in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969):

> [An antitrust plaintiff's] . . . burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4.

▪ The extent to which a presumption of impact is applicable at a subsequent trial on damages and if so, whether it is rebuttable, need not be decided now. Addressing itself to this problem, the Ninth Circuit, after holding the presumptive issues applicable and rebuttable, made the following comments in *Blackie v. Barrack,* 524 F.2d 891, 907 n. 22 (9th Cir. 1975):

> The right of rebuttal, however, does not preclude the predominance of common questions. * * * The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all.

The right to disprove causation will not render the action unmanageable. A defendant does not have unlimited rights to discovery against unnamed class members; the suit remains a representative one. [Citations omitted.] The district judge may reasonably control discovery to keep the suit within manageable bounds, and to prevent fruitless fishing expeditions with little promise of success. He may also exercise discretion in the conduct of the trial, to prevent a time-consuming series of mini-trials on causation, by limiting introduction of repetitive evidence, or by limiting evidence to instances where causation is in doubt; he may also postpone trial of the rebuttal of individual causation until the damage stage of the trial; indeed, he has extensive powers to expedite the suit with procedural innovations.

Such proof, however, does not detract from the inference of impact for purposes of liability raised by causal connection between the alleged artificially inflated market prices and the claimed conspiratorial conduct. The inference of impact is a question common to all class members and is separable from individual issues of actual damage. *Link v. Mercedes-Benz of North America, Inc., supra; In re Master Key Antitrust Litigation, supra; Sommers v. Abraham Lincoln Federal Savings & Loan Ass'n, supra; Barr v. WUI/TAS, Inc., supra.*

▪ As a matter of substantive federal antitrust law, it has been held repeatedly that specific conduct, even if infrequent or relating only to a limited group of victims, nonetheless is unlawful if it has the effect of diminishing the vigor of price competition throughout the industry. *United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *United States v. Socony Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Furthermore, the various elements of the conspiracy are not

to be segregated from each other but are to be viewed as a whole. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *American Tobacco Co. v. United States,* 147 F.2d 93 (6th Cir. 1944); *United States v. FMC Corp.,* 306 F.Supp. 1106 (E.D.Pa.1969). This principle should not be discarded in the context of a class determination. Defendants' liability to the potential class members is not to be determined by dismembering the conspiracy and matching the pieces against each defendant's sales to each class member.

■ Defendants emphasize that each of them did not sell all types of sugar to all customers at all times in all geographic areas of the market. Thus, for example, if a defendant did not sell a type of sugar in a specific location, then in defendants' view, this defendant would be insulated from liability to any member of the plaintiff class in this area who purchased this kind of sugar. Therefore, the commonality of liability and injury issues does not predominate. The law relating to conspiracies and class determinations in federal antitrust cases clearly does not support defendants' contention. If a defendant participates in a conspiracy which increases the price structure, that defendant is liable as a joint tortfeasor with its fellow conspirators. *Wall Products Co. v. National Gypsum Co.,* 357 F.Supp. 832 (N.D.Cal.1973); *State of Washington v. American Pipe & Construction Co.,* 280 F.Supp. 802 (W.D.Wash.1968).

### (c) *The issue of "fraudulent concealment"*

■ This court finds, as did Judge Boldt, that the issue of fraudulent concealment, more likely than not, involves common questions of fact, at least in regard to certain classes of plaintiffs. Balancing the alternative of not certifying the litigation for class action treatment, against the public policy of utilizing private class actions to enforce the antitrust statutes, this court holds that the individual aspects of the question of fraudulent concealment do not predominate over the other common issues.

### (d) *Amstar's Counterclaims*

Defendant Amstar has asserted a variety of counterclaims in its answers to the amended complaints. Counterclaims I through III, which were filed by defendant Amstar in each of the pending actions, are brought against both named and unnamed class members. Counterclaim I charges these counterclaim-defendants with combining and conspiring to fix, stabilize and maintain the prices of refined sugar at an uncompetitive and artificially depressed level in violation of Section 1 of the Sherman Act. Counterclaim II alleges that these same parties provided defendant Amstar with false and misleading information concerning the existence of competing bids to obtain allowances or price reductions from defendant Amstar, in violation of Section 2(f) of the Robinson-Patman Act. Counterclaim III is brought under common law and alleges that the counterclaim-defendants defrauded defendant Amstar and unlawfully interfered in Amstar's business relationships with its general brokers, resulting in allegedly unwarranted price reductions and brokerage fee payments by defendant Amstar.

Counterclaims IV and V, which also have been filed by defendant Amstar in each action, are claims for monies due from absent members of the plaintiff classes either by reason of their alleged failure to pay for sugar purchases or because of their purportedly wrongful deduction of discounts for these purchases. It is not alleged that any named plaintiff is involved in these claims.

Counterclaims VI through IX allege various conspiracies among certain of the unnamed class members to raise the price of various sugar-containing products, including bakery products sold in and around Louisiana and Philadelphia, dairy products sold in and around North Carolina, and bakery products sold in the New York metropolitan area. Counterclaim X alleges that certain absent class members agreed with their franchisors to restrict the suppliers from whom the franchisees could purchase sugar and sugar-containing products.

Defendant Amstar argues that these counterclaims pose serious questions of individual liability, further demonstrating that individual factual issues far outweigh any common questions. Plaintiffs, however, have moved to dismiss defendant Amstar's counterclaims against absent class members on the ground that they fail to state a claim upon which relief can be granted. Pointing out that Rule 13(a) and (b) of the Federal Rules of Civil Procedure permit counterclaims to be filed only against an "opposing party," plaintiffs argue that unnamed class members are not opposing parties within the scope of the *Rules.* In addition, plaintiffs seek to dismiss certain of the counterclaims on the ground that they are based wholly or partly upon averments of fraud that are not stated with particularity as required by Rule 9(b), *Federal Rules of Civil Procedure.*

The question of whether class members who do not intervene or actively participate in a lawsuit are opposing parties within the meaning of Rules 13(a) and (b) has not been resolved in this Circuit. *See AAMCO Automatic Transmissions, Inc. v. Tayloe,* 67 F.R.D. 440, 450 (E.D.Pa.1975). In *Donson Stores, Inc. v. American Bakeries Co.,* 58 F.R.D. 458, 489 (S.D.N.Y.1973), however, the court in an antitrust case squarely held that absent class members are not parties for purposes of Rule 13 counterclaims, stating:

> I interpret this language [*Korn v. Franchard,* 456 F.2d 1206, 1210 (2d Cir. 1972)] to suggest that Rule 23 contemplates an adversary contest involving only the representative members of the class, with all other members of the class being permitted passively to await the outcome of the principal suit. Therefore, in the absence of any reported decision holding that absent class members are parties for the purposes of Rule 13, I hold that they are not. (Footnote omitted.)

*See also Dennis v. Saks & Co.,* 1975–2 Trade Cas., ¶ 60,396 (S.D.N.Y.1975); *Hill v. A–T–O, Inc.,* 1975–1 Trade Cas., ¶ 60,235 (E.D.N.Y.1975); *Serpa v. Jolly King Restaurants, Inc.,* 1974–2 Trade Cas., ¶ 75,301 (S.D.Cal. 1974); *Weit v. Continental Illinois National Bank & Trust Co. of Chicago,* 60 F.R.D. 5 (N.D.Ill.1973). This Court is convinced that *Donson* states the correct rule and, therefore, all counterclaims that purport to state a cause of action against unnamed class members must be dismissed. In accordance with the procedures outlined in *Donson* and *Weit, supra,* counterclaims may be brought against unnamed class members only if and when these class members intervene or file claims in these actions. Although these counterclaims may not be asserted against absent class members at this time, it is entirely appropriate that a brief description of each potential counterclaim be included in the class action notice. *See* Section V, *infra.* "The notice should contain appropriate mention of the entire scope of the case." *Donson, supra* at 490. *See also Serpa, supra* at 97,938.

Plaintiffs also move to dismiss Counterclaims II and III [17] on the grounds that they fail to comply with Rule 9(b) of the *Federal Rules of Civil Procedure,* which provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Thus, a pleading that alleges a cause of action bottomed on fraud must state the time, place and content of the false misrepresentation, the fact misrepresented and what was obtained or given up as a consequence of the fraud. *Seligson v. Plum Tree, Inc.,* 361 F.Supp. 748, 756 (E.D. Pa.1973); 2A J. Moore, Federal Practice ¶ 9.03, at 1925–28 (2d ed. 1975).

A threshold issue here is whether the strict pleading requirements of Rule 9(b) apply to Counterclaim II, which alleges a claim under Section 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f). Although courts have not accepted the argument that Rule 9(b) relates exclusively to common law

---

**17.** In their original motion, plaintiffs sought to dismiss Counterclaims I, II and III for failure to comply with Rule 9(b). In their latest moving papers, however, plaintiffs apparently have restricted their motion to dismiss to Counterclaims II and III.

fraud,[18] Rule 9(b) generally has been applied only to statutory causes of action that are predicated on fraud, and where scienter is an essential element of the claim. *Compare Segal v. Gordon,* 467 F.2d 602 (2d Cir. 1972) and *Reiver v. Photo Motion Corp.,* 325 F.Supp. 214 (E.D.Pa.1971) (Rule 9(b) applies to actions brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)), *with Schoenfeld v. Giant Stores Corp.,* 62 F.R.D. 348 (S.D.N.Y.1974) (Rule 9(b) does not apply to suits brought pursuant to Section 11 of the 1933 Securities Act, 15 U.S.C. § 77k). The parties have not cited to the Court, nor has diligent research revealed, any decisions holding that allegations under Section 2(f) must be stated with the detail and particularity called for by Rule 9(b). In the absence of such authority, this Court declines to hold that allegations under Section 2(f) must be pled with the detail and particularity required by Rule 9(b), and, therefore, plaintiffs' motion to dismiss Counterclaim II must be denied.

 Counterclaim III does state a claim in common law fraud, but the Court agrees with plaintiffs that it fails to satisfy the particularity requirements of Rule 9(b). The Court recognizes that defendant Amstar in Counterclaim III is alleging that plaintiffs conspired over an unspecified period of time to defraud defendant Amstar and interfere with its business relationships with general sugar brokers. Although the Court has no intention of requiring defendant to plead detailed evidentiary matter, *see* 2A J. Moore, Federal Practice ¶ 9.03, at 1930 (2d ed. 1975), nevertheless, a careful review of the averments of Counterclaim III has convinced the Court that they are defective in that they fail to state the time, place and content of the alleged fraudulent activities. *See, e. g., Arpet, Ltd. v. Homans,* 390 F.Supp. 908, 912–13 (W.D.Pa. 1975); *Seligson v. Plum Tree, Inc., supra,* at 756; *Reiver v. Photo Motion Corp., supra,* at 216. For example, Paragraph 24 of defendant Amstar's Answer and Counter-

claims filed in the Owen & Mowrey action specifically charges that:

> Sugar sellers are thus the target of a concerted effort by buyers who use general brokers to reduce the price of sugar and protect the vested interest of the buyers through unlawful means. Counterclaim-defendants initiate and encourage the activities of these general brokers on their behalf and knowingly retain and direct refiner-paid commission revenues to these general brokers for such purposes. As part of their unlawful collusion, counterclaim-defendants have exerted and threatened to exert economic duress upon certain sugar sellers and to force them to continue to sell through general brokers. Such coercion has included concerted threats of and actual refusals to deal with sugar sellers, including Amstar, who have ceased to make payments to these general brokers.

Amstar has not detailed, however, the circumstances surrounding any of these "concerted threats" or "actual refusals to deal." *See also* Paragraph 32(a)–(d). In these circumstances, the Court may consider *sua sponte* plaintiffs' motion to dismiss under Rule 9(b) as a motion for a more definite statement. *Seligson v. Plum Tree, Inc., supra,* at 756; *Arpet, Ltd. v. Homans, supra,* at 913. So considered, plaintiff's motions to dismiss Counterclaim III for failure to comply with Rule 9(b) will be denied without prejudice to renewal if defendant Amstar fails to file a more definite statement in compliance with Rule 9(b) within 20 days from the date discovery on this issue is complete.

Because of the resolution of plaintiffs' motion concerning defendant Amstar's counterclaims, the Court finds that these counterclaims pose no manageability problems under Rule 23(b)(3).

(e) *The issue of "damages"*

 The immediate solution to defendants' predominance and manageability con-

---

18. *See, e. g., Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 378, n. 8 (2d Cir. 1975), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Shamrock Corp. v. Indian Head Inc.,* 20 F.R.Serv.2d 1297, 1298 (S.D.N.Y. 1975).

tentions is to bifurcate this litigation and proceed to trial on all the common elements, and then, if necessary, have individual trials on the damages issue. This approach has become the accepted view among the various federal courts. *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *In re Master Key Antitrust Litigation,* 528 F.2d 5 (2d Cir. 1975); *In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir. 1973); *Illinois v. Bristol-Myers Co.,* 152 U.S.App.D.C. 367, 470 F.2d 1276 (1972); *Bray v. Safeway Stores, Inc.,* 392 F.Supp. 851 (C.D.Cal.1975); *Link v. Mercedes Benz of North America, Inc., supra; Gardner v. Awards Marketing Corp.,* 55 F.R.D. 460 (D.Utah 1972); *In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269 (D.D.C.1972). If such an approach is not adopted, any attempted class action under the federal antitrust laws would fail because, as the federal judiciary has recognized, "damages" is generally an individual question. Nonetheless, while bifurcation continues to be an accepted solution to the aspect of damages in litigation, it has not escaped criticism. *See* American College of Trial Lawyers, *Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure,* 8–10 (1972); *Simon, Class Actions—Useful Tool or Engine of Destruction,* 55 F.R.D. 375, 382–83 (1972). Use of the bifurcation method does not resolve what appears to be a conflict between proof of individual damages and proof of common liability issues. Bifurcation merely delays resolution of the problem until a later date. Hence, if actual individual damages need be proved, and if such determinations are so predominating that ponderous proof problems of individual damages would tax a court's resources to an intolerable degree, a court would be justified in dealing with the damages enigma at the outset in making its determination as to whether a class should be certified.

■ If liability is found, these proceedings would then turn to the determination of damages, the allocation of such damages between classes, and the distribution of damages to class members. At this time, it is the feeling of this Court that the most suitable procedure for the determination of damages sustained by the proposed consumer classes in this litigation, if any, is either by an aggregate class-wide approach or through individualized evidence based on proven and accepted statistical methods. Neither method creates problems of manageability in the proof of plaintiffs' damages nor does either of these methods of proof deny defendants the right to present appropriate rebuttal evidence. Nevertheless, it must be emphasized that this Court's preliminary determination as to the most effective approach to the damages question is in no way necessary to a finding that common factual and legal issues concerning liability predominate. As has been demonstrated previously, common questions relative to the liability portion of this litigation do exceed damages questions.

■ The precise relationship between fact of injury and amount of injury has long proved troublesome, particularly in cases where a conspiracy to fix prices has been shown. The obvious problem for the courts is that no competitive price is available to contrast with the price artificially established by the conspiracy. Defendants in private antitrust actions commonly use this absence to their advantage, contending that damages should not be assessed unless measured with demonstrable certainty. Neither the United States Supreme Court nor the circuits have given this attitude much support. Instead, they have permitted plaintiffs to come forward with proof showing injury by a just and reasonable inference and by approximately establishing what the amount of such injury has been. The proper question before this Court, therefore, is not whether the amount of damages can be established with absolute certainty, but whether plaintiff's proof allows a just and reasonable inference that damage in an approximate amount occurred in this litigation should defendants ultimately be found liable.

This rule was first articulated over 40 years ago in *Story Parchment Co. v. Patterson Parchment Paper Co.,* 282 U.S. 555, 563,

51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), wherein the Court stated:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

The Court reaffirmed this doctrine in *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), accepting a just and reasonable inference that plaintiffs were damaged by defendants' action, and again more recently in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969), saying:

> [T]he injury alleged by [plaintiff] Zenith was precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause. The trial court was entitled to infer from this circumstantial evidence that the necessary causal relation between the [defendants'] conduct and the claimed damage existed.

*See Gould v. American-Hawaiian Steamship Company,* 535 F.2d 761, 782 (3d Cir. 1976).

Even before the Federal Rules of Evidence were enacted by Congress, the draftsmen of the *Manual for Complex Litigation* had recognized the potential value of sophisticated sampling, polling and statistical techniques for the proof of facts in complex litigation matters:

> The employment by businesses and professions of electronic means of recording and retrieving large masses of data, of summarizing and drawing conclusions from such masses of data and the employment by businesses and professions of samples, polls, surveys and sophisticated statistical analyses to ascertain facts have resulted in novel problems of proof in complex cases, as well as in some simple cases. For instance, electronically processed data may be offered to prove the state of accounts, the existence of material economic conditions in a major business or industry and material conclusions in a relevant field of business or science. Further, the results of recognized methods of employing samples, polls and surveys, accepted as reliable in business and in science may be offered in evidence as proof of substantially reliable facts concerning the whole of the universe to which they relate. *Manual for Complex Litigation,* "Proof of Facts in Complex Cases," Part I, § 2.71 (rev. ed. 1973).

Written in 1973, these new methods of ascertaining facts and arriving at conclusions presented new problems of proof. Manifestly, even under the old rules of evidence, no barrier to admissibility would exist if the survey or poll was itself a business record, an admission of a party, or if the data underlying the survey or poll were admissible. Although the authors of the *Manual for Complex Litigation* urge a contrary position amply supported by decisional law, *id.* at 73–77, it nonetheless is clear that serious obstacles have existed to the admissibility of a survey or poll prepared in preparation for litigation and based upon data which was not itself admissible.

The new *Federal Rules of Evidence* put to rest these problems of proof that existed in 1973. Rule 703 of the *Federal Rules of Evidence* provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The Advisory Committee Note to Rule 703 explains how the new Rule goes beyond the previous common law rules of evidence:

> The rule also offers a more satisfactory basis for ruling upon the admissibility of public opinion poll evidence. Attention is

directed to the validity of the techniques employed rather than to relatively fruit-less inquiries whether hearsay is involved.

Even if no other admissible data, surveys or polls were available, Rule 703 provides the basis for constructing and applying a reliable statistical model that will allow the individualized and definite proof of damages sustained by class members. It requires no departure from accepted evidentiary rules to allow opinion evidence regarding the amount of overcharge passed on to the ultimate consumer or user of refined sugar. The total sales of refined sugar are available from the business records of the parties to this litigation. Even if not otherwise available and admissible, survey or polling techniques of a type reasonably relied upon by experts [19] in this particular field in forming opinions or inferences can be constructed to determine consumption of refined sugar by certain potential class members.

▇▇ There is no merit to the argument that proof of damages in this manner somehow modifies substantive rights and liabilities beyond the United States Supreme Court's power to promulgate procedural rules. *Sibbach v. Wilson,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). In this regard, the thoughts of Judge Miles Lord are relevant:

> Most important management decisions in the business world in which these defendants operate are made through the intelligent application of statistical and computer techniques and these class members should be entitled to use the same techniques in proving the elements of their cause of action. The court is confident that they can be successfully utilized in the courtroom and that their application will allow the consumers to protect their

rights while freeing the court and the defendants of the specter of unmanageability. *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278, 289 (S.D.N.Y.1971).

And, if such an argument—that the technique of aggregate damages prejudicially compromises defendants' substantive rights—ever had any validity, it is now of only historical interest. If proof of damages through statistical methods modifies pre-existing practice, it is a modification that results from the congressional enactment of Rules 703 and 403 and not from any exercise of the United States Supreme Court's power to promulgate rules of procedure.

In this litigation, defendants have maintained records and publicly have reported sales according to classes of purchasers. Consequently, it is possible to develop accurate statistical information of total sales to industrial and institutional users, wholesalers and retail grocers seeking class certification. The price effects of the alleged conspiracy may be established by economic analysis of the consistent marketing process in the market. The amount that prices were raised by the purported conspiracy may be developed by formulae based on the aforementioned devices to obtain reliable statistical and market data. Upon the establishment of such aggregate damages as may be assessed against defendants, the problem of allocations among classes and distribution within each class largely becomes a plaintiffs' problem, which should not militate against the certification of these classes. *In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir. 1973), recognizes that the allocation between classes of illegal overcharges is a separate issue to be resolved between direct and indirect purchasers. Even the *Manual for*

---

**19.** 4 Wigmore, Evidence § 1230 (Chadbourn rev. 1972) states:

"Where a fact could be ascertained only by the inspection of a large number of documents made up of very *numerous, detailed statements* —as, the net balance resulting from a year's vouchers of a treasurer or a year's accounts in a bank ledger—it is obvious that it would often be practically out of the question to apply the

present principle by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result. Such a practice is well established to be proper."

*Complex Litigation* provides assistance in this regard, whereby it announces principles in settlement situations that are equally applicable to a court's responsibilities for allocations among classes after a liability trial and the determination of aggregate damages:

> * * * The apportionment of the total proposed settlement among the several classes requires reliable economic data on which a finding of injury and damages to each class can be based. And there may be cases in which some of the plaintiff classes not only were not damaged but may have profited as a result of the illegal practices. * * * In this connection it should be noted that the interest most likely to be adversely affected by the absence of reliable economic data in a civil antitrust treble damage action, for instance, is the consumer interest which it is the policy of the law to protect. Further, the consumer is ordinarily the person who has the least means and motive to engage in and vigorously prosecute complex litigation. So the court must be particularly sensitive to the need of the consumer class for reliable economic data to protect its interest. (Footnote omitted.) *Manual for Complex Litigation,* "Settlement of Class Actions: Criteria and Procedure in Approving Settlements in Class Actions," Part I, § 1.46 (rev. ed. 1973).

■ Classwide recovery of damages has been upheld in a number of disputes as being consistent with due process. For example, if defendants are found to have precluded the existence of an actual competitive price in the market, the most elementary conceptions of justice and public policy require that they bear the risk of any uncertainty as to the actual damages that they created by their violations. No wrongdoer should be entitled to complain that damages cannot be measured with the precision that would have been possible had the situation it alone caused been otherwise.

*Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Patterson Parchment & Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir. 1964), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Furthermore, proof of damages in an aggregate sum does not deny defendants any right to present their defenses, such as a plaintiff's passing of the alleged monetary injury to another in the chain of marketing.

At this stage of the proceedings, the court fails to see any due process violations, following the procedures discussed above.[20]

Many years ago, the federal courts rejected attempts by defendants to establish that plaintiffs must perform the difficult, if not impossible, task of establishing the hypothetical competitive price separately for each transaction by extrapolation from the myriad of competitive factors that might exist at any particular place or time. *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir. 1964), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). If this Court were to adopt defendants' argument and deny these class actions because the computation of damages on even an individual basis destroys the "predominance" requirement of Rule 23(b)(3), it would be tantamount to encouraging wrongdoers to commit great antitrust violations on many consumers in small amounts so as to raise the spectre of unmanageability to defeat a class action. This issue was characterized aptly by Judge Real in *California v. Frito-Lay, Inc.,* 333 F.Supp. 977, 981 (C.D.Cal. 1971), *rev'd and remanded,* 474 F.2d 774 (9th Cir. 1973), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2291, 36 L.Ed.2d 974 (1973):

> But what corporation would not risk violation of the antitrust laws where maximum penalties are miniscule compared to the potential harm to a public unable to meet the "technical" requirements of

---

**20.** ". . . realizing as our cases regularly do that the interpretation and application of the Due Process Clause are intensely practical matters and that '[t]he very nature of due process

negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Goss v. Lopez,* 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975).

proof of damage? Or, even more to the point—what corporation would risk violation of the antitrust laws if they were assured every penny of conspiratorial gain, three times over, were the ultimate result of a proven price-fixing conspiracy? Putting the question is its own obvious answer.

Simply because common questions must predominate is not equivalent to the proposition that they must be dispositive of the entire litigation. Indeed, individual questions of law or fact peculiar to certain potential class members may remain after the common issues are resolved.

While the effective distribution of monetary damages directly to class members remains to be explored, it is neither necessary nor appropriate to decide at this juncture the method of distribution of damages, if any, that will be most beneficial to members of any class.

 Bifurcation of the issues of liability and damages seems to be the most appropriate way to proceed in this case. If the plaintiffs prevail in the liability phase of the case, then the court would direct the plaintiffs to submit proposals for the expeditious resolution of the damage issues. The court would than review such proposals to determine whether the method of proving damages will satisfy constitutional and procedural requirements and still permit the efficient use of court time. For example, it may be possible to utilize a Master to calculate damages of individual class members. *Connecticut Importing Co. v. Frankfort Distilleries, Inc.,* 42 F.Supp. 225, 226–27 (D.Conn.1940). Also, plaintiffs may be able to utilize expert testimony, statistical computation and computer analysis to simplify the proof of damages. In any event, the court has the right to decertify the class following a determination of liability against the defendants if the plaintiffs are unable to develop a method of proving damages which will permit the trial to proceed in an efficient manner. The use of bifurcated trials in antitrust cases has been approved in *In re Master Key Antitrust Litigation, supra.*

In any event, since a procedure may well be implemented to distribute damages to the *victims* of the alleged wrong-doing, the "fluid recovery" objection of the defendants can be obviated.

2. *"Superiority of a Class Action to Other Available Means for the Fair and Efficient Adjudication of the Controversy"*

The second requirement of Rule 23(b)(3) —that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy"—raises the problem of "manageability." Defendants argue that the certification of class actions for this litigation is improper because, considering the number and diversity of actual and potential plaintiffs asserting claims against defendants, it will be difficult to conduct discovery and eventually to try these various class lawsuits efficiently and expeditiously. Aggrieved refined sugar purchasers are capable of instituting their own lawsuits if they are interested now in prosecuting a claim via these proposed class actions, defendants contend. In addition, if these actions are certified as classes, defendants maintain that each class action would degenerate quickly into individual lawsuits and become unmanageable. Given the size of the classes proposed and the issues to be resolved as to each purported class member for each sugar product for each geographic area during a certain period of time, defendants state, the burden upon the judicial system would be intolerable and the benefit to aggrieved class members, if any, would be negligible. As one alternative to the formation of classes, defendants suggest that the utilization · of multidistrict litigation techniques and procedures, subsequent to the Panel's transfer of individual lawsuits to this Court pursuant to 28 U.S.C. § 1407, provides ample safeguards and flexibility to both protect and facilitate potential class members in their individual prosecution of lawsuits against defendants. Also, intervention under Rule 24 of the Federal Rules of Civil Procedure is available to possible class

members, defendants maintain, which, by virtue of such action, would illustrate to this Court an intervening plaintiff's interest in this litigation.

■ Three reasons exist for granting class action certification when only speculative manageability difficulties are perceived. First, the nature of our judicial system mandates that our courts provide a forum for the redress of injuries, and they should not shirk this responsibility because of conjecture. Secondly, at the outset of litigation, consideration of future manageability is by necessity limited because discovery has not advanced to the point where certain judgments can be made regarding the relative ease or difficulty with which the litigation will progress. Lastly, Rule 23(c)(1), which requires a court to determine the propriety of a class action as soon as practicable after institution of the lawsuit, also allows the courts the luxury of later altering or amending the class certified before any decision on the merits is rendered. It must be remembered that a determination granting a class action always may be modified upon fuller development of the facts, but a negative determination may sound the death knell of the action as one for a class of persons or entities. *Compare Eisen v. Carlisle & Jacquelin,* 370 F.2d 119 (2d Cir. 1966), *cert. denied,* 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967) (denial of class certification appealable under 28 U.S.C. § 1291); *with Walsh v. City of Detroit,* 412 F.2d 226 (6th Cir. 1969) (class certification not appealable under 28 U.S.C. § 1291); *and Kohn v. Royall, Koegel & Wells,* 496 F.2d 1094 (2d Cir. 1974) (class certification appealable under 28 U.S.C. § 1291 only in certain narrow circumstances).

Moreover, denial of class certification because of suspected manageability problems is disfavored among both the courts and the legal commentators because a court refusing to certify a class action on the basis of vaguely perceived manageability obstacles is acting counter to the policy behind Rule 23, and because that court is discounting unduly its power and creativity in dealing with a class action flexibly as difficulties arise. *See, e. g., Yaffe v. Powers,* 454 F.2d 1362 (1st Cir. 1972); *Manual for Complex Litigation,* "Management Problems," Part I, § 1.43 (rev. ed. 1973). Along these lines, Judge Weinstein's remarks are appropriate:

It seems to me that this matter touches on the credibility of our judicial system. Either we are committed to make reasonable efforts to provide a forum for the adjudication of disputes involving all our citizens—including those deprived of human rights, consumers who overpay for products because of antitrust violations, and investors who are victimized by misleading information—or we are not. There are those who will not ignore the irony of courts ready to imprison a man who steals some goods in interstate commerce, while unwilling to grant a civil remedy against a corporation, which has benefited to the extent of many millions of dollars from collusive, illegal pricing of goods. Weinstein, *Some Reflections on the "Abusiveness" of Class Actions,* 58 F.R.D. 299, 305.

And as Professor Miller so aptly stated:

Class actions under Rule 23(b)(3) pose many new challenges to the federal courts that must be met with flexibility and imagination. Fortunately, the amended rule gives them numerous tools with which to administer and expedite large cases that otherwise might well prove unmanageable if the court were obliged to follow a more rigid and less fluid procedural structure. If properly utilized, it may well be that Rule 23, for all of its complexity and the many questions its text leaves unanswered, will prove to be a key building block in the federal courts' continuing effort to make our procedural system responsive to the needs of contemporary society. Miller, *Problems in Administering Judicial Relief in Class Actions under Federal Rule 23(b)(3),* 54 F.R.D. 501, 513.

Even the Board of Editors for the *Manual for Complex Litigation* has recognized that defendants typically assert unmanage-

ability as a major reason in their opposition to consumer class actions:

> Particularly in consumer class actions, where the potential or actual class members may number in the millions, the assertion of unmanageability is typically pressed upon the court. In considering whether the proposed class action is "superior," the court must make a realistic evaluation of the "other available methods," keeping in mind the purposes for which amended Rule 23 was designed. For it is just such situations where representative treatment may be most needed, since separate suits by the many plaintiffs or against the many · defendants would pose an intolerable burden on the party opposing the class as well as the judicial system; and denial of the class action might well mean a total denial of relief as a practical matter for the persons injured. [Footnote omitted.] *Manual for Complex Litigation,* "Management Problems," Part I, § 1.43 (rev. ed. 1973).

With these thoughts in mind, the Board of Editors cautions judges against their rejection of the class action device:

> Dismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule. *Manual for Complex Litigation,* "Management Problems," Part I, § 1.43 n. 36 (rev. ed. 1973).

 Experience under 28 U.S.C. § 1407 and Rule 23 shows that visions of unmanageability soon disappear, because courts, together with counsel, have been able to manage litigation of constantly increasing complexity and magnitude. Given the sizes of the classes requested, the power of this Court to modify class definitions, if such proves necessary, and the ingenuity of this Court and counsel to solve administrative problems, if and when they arise, this Court is convinced that the class action technique is the superior method of adjudicating this litigation. Once again, reference is made to the *Manual for Complex Litigation,* "Management Problems," Part I, § 1.43 (rev. ed. 1973), which maintains:

> Rule 23 grants to the court broad discretionary powers to enable the court successfully to solve the novel administrative problems posed in a class action by the unusually large number of members of the class, each of whom may have small monetary claims.

> \* \* \* \* \* \*

> Because of the plenary authority granted to the court to control class action litigation, the problems of administration, alone, ordinarily should not justify denial of an otherwise appropriate class action request except when the attention and resources required to be devoted strictly to administrative matters will frustrate the securing of ultimate relief to which the class members may be entitled. [Footnotes omitted.]

Congress' intent to promote the private enforcement of the federal antitrust laws is embodied in the treble-damage provision of Section Four of the Clayton Act. 15 U.S.C. § 15. Congress has expressed its belief that private antitrust litigation is one of the best weapons for the effective enforcement of these laws. *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.,* 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). In addition, the United States Supreme Court has called the private civil action a bulwark of antitrust enforcement, whereby the purposes of the federal antitrust laws are best served by the ever-present threat of these types of lawsuits to deter anyone contemplating business misbehavior. *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). *See also Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Hence, Rule 23 is a remedial procedural device that should be construed · and applied liberally (*Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir. 1968); *Escott v. Barchris Construction Corp.,* 340 F.2d 731 (2d Cir. 1965); *Gerstle v. Continental Airlines, Inc.,* 50 F.R.D. 213 (D.Colo.1970)) so that it may be consonant

with the remedial purpose and the therapeutic role of federal antitrust litigation (*Siegel v. Chicken Delight, Inc.,* 271 F.Supp. 722 (N.D.Cal.1967)).

It is manifest that the maintenance of class actions is superior to the institution of a multitude of individual lawsuits for several reasons: (1) the alleged economic injuries to many proposed class members are too minuscule to justify their independent commencement of actions; (2) the proliferation of lawsuits that otherwise would result from the alleged pervasive conspiracy absent class actions will be minimized; (3) duplicative efforts by the judiciary and the litigants will be eliminated; (4) duplicative litigation expenses and attorneys' fees will be prevented; (5) defendants will be relieved from the burden of defending numerous lawsuits geographically scattered throughout the nation; and (6) inconsistent judicial decisions will be avoided. *Iowa v. Union Asphalt & Roadoils, Inc.,* 281 F.Supp. 391 (S.D.Iowa 1968); *In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269 (D.D.C.1972); *Illinois v. Harper & Row Publishers, Inc.,* 55 F.R.D. 221 (N.D.Ill.1972); *City of Philadelphia v. American Oil Co.,* 53 F.R.D. 45 (D.N.J.1971); *Minnesota v. United States Steel Corp.,* 44 F.R.D. 559 (D.Minn.1968). The federal bench and bar must remain cognizant of the fact that difficulties in the management of class actions should not lead to a conclusion that class actions are not superior to other available means for the fair and efficient adjudication of the controversy. Manageability problems are significant only if they create a situation that is less fair and efficient than other available techniques. *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278 (S.D.N.Y. 1971). This perspective is important in this litigation because defendants, after reciting potential manageability hassles, offer no other remedy that is better than this purportedly imperfect one.

\* \* \*

■ Moreover, defendants' protracted discussion of the merits of plaintiffs' claims is irrelevant to a determination of whether the proposed classes have satisfied the requirements for certification under Rule 23. It is well established that, because class determination is required at an early stage of the proceedings, a court is not authorized to permit or require a preliminary inquiry into the merits of a plaintiff's actions to decide whether the lawsuit meets Rule 23's requisites. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The uncertain state of the record in which a court must rule necessarily requires some degree of speculation. Hence, all that is mandated under *Eisen* is that this Court has material before it sufficient to enable it to determine the nature of the allegations and to rule on whether the criteria of Rule 23 have been satisfied. If this Court bases its decision on such material, its approach cannot be faulted because plaintiffs' proof may fail later. On this subject, the Ninth Circuit held in *Blackie v. Barrack,* 524 F.2d 891, 900–01 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976):

From a thorough review of the district judge's opinion, we think it apparent that he analyzed the allegations of the complaint and the other material before him (material sufficient to form a reasonable judgment on each requirement), considered the nature and range of proof necessary to establish those allegations, determined as best he was able the future course of the litigation, and then determined that the requirements were met at that time. That is all that is required.

Defendants misconceive the showing required to establish a class under *Hotel Telephone Charges* [500 F.2d 86 (9th Cir. 1974)]. We indicated there that the judge may not conditionally certify an improper class on the basis of a speculative possibility that it may later meet the requirements. 500 F.2d at 90. However, neither the possibility that a plaintiff will be unable to prove his allegations, or the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule. The district judge is required by Fed.R.Civ.P.

23(c)(1) to determine "as soon as practicable after the commencement of an action brought as a class action . . . whether it is to be so maintained." The Court made clear in *Eisen IV* that that determination does not permit or require a preliminary inquiry into the merits, . . . thus the district judge is necessarily bound to some degree of speculation by the uncertain state of the record on which he must rule. [Footnotes omitted.]

## IV. CLASS DESIGNATIONS

 The following are designated as plaintiff classes, with further elaboration as to the representative parties, their counsel and the transferee district civil action numbers set forth in Appendix A:

A. *Class One*—consisting of all persons or private entities doing business as industrial sugar users in the Eastern Market who have purchased refined sugar for use or incorporation in producing, manufacturing or processing foodstuffs, including beverages, for human or animal consumption, and who have not offered such sugar for resale as sugar.

B. *Class Two*—consisting of all persons or private entities doing business as retail grocers in the Eastern Market who have purchased refined sugar for the eventual resale of such sugar as sugar for use or incorporation by the consumer in a variety of foodstuffs or beverages for human or animal consumption.

C. *Class Three*—consisting of all persons or private entities doing business as institutional sugar users in the Eastern Market who purchased refined sugar for use or incorporation in processing foodstuffs or beverages for human or animal consumption, or as condiment in the serving of meals, by any restaurant, airline, hotel, hospital, school, fast-food chain, drinking establishment or other similar institution.

Excluded from these three classes are (a) the defendants, their subsidiaries and affiliated business entities, (b) members of the public who purchased sugar for nonbusiness use, (c) governmental entities, and (d) each plaintiff who has instituted and presently is maintaining his or its own nonclass action.

## V. NOTICE

 This Court declines to postpone until another day the question of the most appropriate notice to be disseminated to potential class members. Once a court exercises its power to define a class (*P.D.Q., Inc. of Miami v. Nissan Motor Corp. in U.S.A.,* 61 F.R.D. 372 (S.D.Fla.1973)), it would be derelict in its duties to delay its decision concerning proper notification to the class just defined. *See Fed.R.Civ.P.* 23(c)(1) and (c)(2). One of the reasons for Rule 23(c)(1)'s demand—that as soon as practicable after the commencement of a lawsuit instituted as a class action, a court shall determine whether it is so maintainable—is so potential class members can be notified of such a proceeding, thereby alerting them to the dispute and allowing them to forego the institution of individual actions.

Because the notification issue is addressed by this Court at this time, it should be noted initially that individual notice has never been required to be given every possible member of each class certified. Rather, in construing the clear provisions of Rule 23(c)(2), courts have required individual notice to be given to every "identifiable" class member concurrent with some other form of notice to the unidentifiable class members. Indeed, in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974), the United States Supreme Court stated:

> We think the import of this language [of Rule 23(c)(2)] is unmistakable. Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort.

In the litigation at bar, the majority of potential members in each class appear to be members of various trade associations who, in turn, maintain current membership

lists and publish periodic trade journals. Other lists of business establishments are maintained by trade associations as well as by business service organizations. Similarly, the "Progressive Grocers Marketing Guide Book" and the "Thomas Grocery Directory" are compilations by publishers who maintain exhaustive computerized lists of retail grocery stores. Together with other sources, such as defendants' refined sugar sales records, these various lists will facilitate individual notice to the different class members who may desire to participate in this litigation. The members of the industrial users associations alone purchase the majority of all industrial sugar consumed in the market. Without doubt, it appears that plaintiffs are both willing and able to provide notice to each possible class member either known to them or identifiable through reasonable diligence.

■ Therefore, this Court will require the designated class representatives, at their own expense and on behalf of their respective classes, to exert reasonable effort to identify the name and address of every class member possible and, thereafter, to provide those class members with individual notice of the pendency of this litigation. Because the type of notice to be given any unascertainable class members is within the sound discretion of this Court, plaintiffs may be compelled in the future to publish the aforementioned notice to any unknown and not easily ascertainable class members. If future circumstances so warrant, it is this Court's view that notice by publication is the best practicable method of informing unknown class members of this matter via secular and financial newspapers and magazines of wide circulation.

Counsel for plaintiffs shall forward drafts of their proposed individual form of notice, which shall fulfill the requirements of Rule 23(c)(2), to this Court for approval and to opposing counsel for their comments by no later than November 30, 1976. Any objections to the proposed notice shall be filed within ten business days thereafter.

Liaison counsel for the plaintiffs is directed to prepare and submit for signature an Order encompassing the holdings in this Opinion.

## APPENDIX A

| Plaintiff Class Representatives | Transferee District Civil Action Number | Counsel for Plaintiff Class Representatives |
|---|---|---|
| CLASS ONE: Industrial Users | | |
| Milton Freedman d/b/a Alice Best Candies | C75–514–ENC | Kramer & Salus Law Offices of Herbert R. Newberg |
| Owen & Mowrey, Inc. | C75–2621–ENC | Law Offices of Samuel H. Seymour |
| CLASS TWO: Retail Grocers | | |
| Leonard Greenberg d/b/a Food Mart | C75–2519–ENC | Danzansky, Dickey, Tydings, Quint & Gordon |
| CLASS THREE: Institutional Users | | |
| Luigi's Trattoria, Inc. d/b/a Luigi's | C75–2245–ENC | Law Offices of David C. Harrison |
| Montelepre Memorial Hospital, Inc. | C75–2521–ENC | Garon, Brener & McNeely |
| Pascal's Manale Restaurant, Inc. | C75–2520–ENC | Garon, Brener & McNeely |